**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:99-cr-00201-REP** |
| | ) | |
| **VALLIA CAROLYN FRIEND,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MOTION FOR COMPASSIONATE RELEASE PURSUANT TO SECTION 603(B) OF THE FIRST STEP ACT AND 18 U.S.C. § 3582(c)(1)(A) WITH INCORPORATED MEMORANDUM OF LAW**

Vallia Carolyn Friend, through counsel, respectfully moves this Court to grant her immediate release from Burau of Prisons' (BOP) custody under section 603(b) of the First Step Act (codified at 18 U.S.C. § 3582(c)(1)(A)), and order that a portion of the remainder of her sentence be served on home confinement as a condition of her supervised release.

Vallia Carolyn Friend is incarcerated at Waseca FCI, in Waseca Minnesota. She has been in prison for twenty years, and is serving a life sentence. She is 69 years old and has severe obesity, along with several other health conditions, including bipolar disorder. Her health conditions place her at severe risk of serious injury from the unprecedented COVID-19 pandemic. To date, in the United States alone, there are more than 8.2 million confirmed cases and over two hundred and twenty thousand deaths from COVID-19.[1] Ms. Friend is of an age that places her at high risk, and also has pre-existing medical conditions have been linked to serious complications associated with COVID-19 infection.[2]

---

[1] "Cases in the U.S." Centers for Disease Control and Prevention, 22 October 2020, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Oct. 22, 2020).

[2] "Assessing Risk Factors for Severe COVID-19 Illness." Centers for Disease Control and Prevention, 25 June 2020, https://www.cdc.gov/coronavirus/2019-ncov/covid-

Ms. Friend now respectfully moves this Court to grant her motion for compassionate release under section 603(B) of the First Step Act (codified at 18 U.S.C. § 3582(c)(1)(A)).  This motion should be granted because the global COVID-19 pandemic, combined with Ms. Friend's age and severe obesity, presents an "extraordinary and compelling reason" for compassionate release.

While COVID-19 infection can lead to complications in people over 65, people of all ages with chronic health conditions can be at risk of serious complications or death.[3] Currently, there are no cures or highly efficacious methods of treating COVID-19.[4]  One of the only known mechanisms for preventing infection is social distancing, or maintaining a considerable distance from others while in public and limiting excursions to potentially crowded locations.[5] This is all but impossible within the confines of a crowded correctional institution.

Ms. Friend is particularly susceptible to COVID-19 and is more likely to suffer dire consequences from the virus due to her age and severe obesity.  Ms. Friend's incarceration at FCI Waseca has already exposed Ms. Friend to a particularized risk – she contracted COVID-19 in late September. Ms. Friend's infection with COVID-19 does not mean that she is at a lower

---

data/investigations-discovery/assessing-risk-factors.html (last visited July 22, 2020); *see also* "People Who Are at Increased Risk for Severe Illness." Centers for Disease Control and Prevention, 25 June 2020, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited July 22, 2020).

[3] "People Who Are at Increased Risk for Severe Illness." Centers for Disease Control and Prevention, 25 June 2020, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited July 22, 2020).

[4] "Information for Clinicians on Investigational Therapeutics for Patients with COVID-19." Centers for Disease Control and Prevention, 25 April 2020, https://www.cdc.gov/coronavirus/2019-ncov/hcp/therapeutic-options.html (last visited July 22, 2020).

[5] "Social Distancing." Centers for Disease Control and Prevention, 15 July 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited July 22, 2020).

risk of contracting the disease in the future – in fact, evidence suggests that COVID-19 antibodies leave the body within only a few months of contracting the disease, leaving a person who has clinically recovered from COVID at risk of reinfection.[6] Even the CDC acknowledges that infection may only lead to three months of immunity from the virus.[7] There is also evidence that COVID-19 leaves people weaker, and more at risk for other severe illnesses.[8] Courts, recognizing this fact, have continued to grant compassionate release motions to at-risk individuals who have been infected with COVID-19. The virus thrives in densely packed populations, and FCI Waseca is ill-equipped to contain the pandemic and prevent COVID-19 from spreading to inmates like Ms. Friend.  Allowing Ms. Friend to finish out the rest of her sentence on home confinement at her friend Lori Watson's home in Chicago is the only prudent and just response to the extraordinary and compelling circumstances created by the novel coronavirus.

Ms. Friend is not a danger to the community, and her release plan adheres to the mandates of Section 3553(a), particularly in light of the cataclysmic events of this pandemic. We

---

[6] Morgan McFall-Johnsen, "Coronavirus antibodies may disappear 2 to 3 months after people recover, a new study found," BUSINESS INSIDER (June 18, 2020), available at: https://www.businessinsider.com/coronavirus-antibodies-only-last-months-weaker-in-asymptomatic-cases-2020-6 (Studying 96 patients and health-care workers at Guy's and St Thomas' NHS Foundation)

[7] CDC, "Updated Isolation Guidance Does Not Imply Immunity to COVID-19," 14 August 2020, available at: https://www.cdc.gov/media/releases/2020/s0814-updated-isolation-guidance.html (last accessed October 25, 2020).

[8] Michael Marshall, "The lasting misery of coronavirus long-haulers," Nature, 14 September 2020, available at: https://www.nature.com/articles/d41586-020-02598-6 (stating that, "[p]eople with more severe infections might experience long-term damage not just in their lungs, but in their heart, immune system, brain and elsewhere. Evidence from previous coronavirus outbreaks, especially the severe acute respiratory syndrome (SARS) epidemic, suggests that these effects can last for years")

respectfully ask the Court to consider this motion on an expedited basis as the risk to Ms. Friend's life multiplies exponentially with each passing day.

## FACTUAL BACKGROUND

In April of 1999, Ms. Friend took part in two car-jackings, along with her three sons and their associates, including Charlene Thomas, the girlfriend of the eldest Friend brother.[9] During the car-jackings, two independent truck drivers were held in the tractor of their tractor-trailers while the group used them to transport stolen goods, including lumber and carrots, around Virginia, Tennessee, and Texas. In the first car-jacking, the victim was beaten by the Friend brothers, but was ultimately left in the tractor of his tractor-trailer, with a note telling him where he could find her trailer. In the second car-jacking, the victim was beaten inside his tractor and then killed in a location near Lake Anna by the Friend brothers and one of their associates before the group used the tractor to move other trailers.

Ms. Friend's role in the car-jacking consisted of hailing the independent drivers, and, along with Charlene Thomas, speaking to the men in order to get them out of their trucks.[10] She also drove a van behind the stolen trucks, and cashed a check for the stolen lumber, which the group sold to a lumber mill. Ms. Friend was not present for the beatings or killing, instead, the Friend brothers instructed her and Ms. Thomas to wait at a specified location.

Ms. Friend was 49 when she participated in these terrible crimes.  Prior to this point, her only criminal history was for cashing a few bad checks, and twice exceeding the speed limit to the point that it was reckless driving.  Ms. Friend, who had been diagnosed with bipolar disorder only two months before the incidents occurred, refused to cooperate with the investigation and

---

[9] Dkt. 840 at 5-9.
[10] *Id.* at 5, 7-8.

4

refused to plead guilty, instead going to trial. Her sons were facing the death penalty, and she worried that by cooperating with the government or pleading guilty, she would incriminate them. Ms. Friend was found guilty by a jury of one count of conspiracy to interfere with interstate commerce in violation of 18 U.S.C. § 1951(a) and two counts of carjacking in violation of 18 U.S.C. §§ 2119(1) and (3).[11] [12] This Court was required to sentence her to life imprisonment under the mandatory guideline regime, based on a total offense level of 50, a criminal history category of II, and several factors that warranted upward departure.[13] She has now been incarcerated since July 1999.

Ms. Friend is currently incarcerated at FCI Waseca, in Waseca, MN. She has had no disciplinary history in the last ten years, and only has one violation on her record ever, for refusing to obey an order in 2009. She has taken a number of classes while incarcerated, and is particularly interested in film and film history classes. She has been evaluated as a low security risk and a low risk of recidivism.[14]

FCI Waseca has seen over 450 cases of COVID-19 amongst inmates, including Ms. Friend, almost all of which have taken place in August and September 2020, well after the BOP began to implement its policies aimed to reduce the spread of COVID-19.[15] It has 23 total active cases amongst inmates and staff.

---

[11] *Id.* at 1.
[12] *Id.* at 15-16.
[13] *Id.* at 23-24.
[14] Ms. Friend's inmate profile has been attached as Exhibit A. The relevant reference here is Ex. A at 1.
[15] Department of Justice, Office of the Inspector General, "Facility-Level BOP COVID-19 Trends, FCI Waseca," as of 25 October 2020, available at: https://www.arcgis.com/apps/MapSeries/index.html?appid=a3e98be1aab94eadaaeaa96ed176f418 (last accessed Oct. 25, 2020).

Ms. Friend submitted a request for compassionate release to the warden on June 22, 2020, which was denied on June 29, 2020.[16] She filed a pro se motion for compassionate release on September 17, 2020, citing her age, race, and medical conditions as putting her at risk of severe illness from COVID-19 and constituting an "extraordinary and compelling" for compassionate release. She tested positive for COVID-19 a few days later.

## ARGUMENT

## I.    The Court Has Jurisdiction to Grant Ms. Friend's Immediate Release.

On December 21, 2018, the First Step Act became law.  Among the criminal justice reforms enacted in this landmark legislation, Congress amended 18 U.S.C. §  3582(c)(1)(A)(i) to allow, for the first time, defendants to move for a reduction of sentence based upon extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*[.]"  First Step Act of 2018, § 603(b), Pub. L. 115- 391, 132 Stat. 5194, 5239 (Dec. 21, 2018).  By providing this exceptionally short 30-day waiting period, Congress plainly sought to expedite judicial consideration of such motions and expedite defendants' access to the courts.  *See, e.g., United States v. Haney*, 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020).

In this case, 30 days have passed since Ms. Friend made her request for compassionate release to the warden on June 22, 2020.  The 30-day exhaustion period begins when a defendant submits her or her request for compassionate release to BOP staff.  Courts in this district and throughout the country have found that the exhaustion requirement is satisfied upon the passage

---

[16] Dkt. 837 at 5.

of thirty days since a prisoner's request for compassionate release, regardless of whether the BOP issues a denial of the request in the meantime. *See, e.g., United States v. Wilson*, Case No. 2:11cr180, Dkt. No. 663, at 4-5 (E.D. Va. May 29, 2020) (J. Jackson) (finding exhaustion satisfied where defendant submitted request for compassionate release to the warden on March 27, 2020, which was subsequently denied on April 10, 2020, within the 30 days of the request); *United States v. Latney*, Case No. 1:19cr202. Dkt. No. 36, at 4, n.4 (E.D. Va. June 2, 2020) (J. Trenga); *United States v. Robinson*, Case No. 3:10cr261, Dkt. No. 86, at 8 (E.D. Va. July 17, 2020) (J. Lauck); *United States v. Geister*, Case No. 2:10cr127, Dkt. No. 52, at 3-4 (E.D. Va. Aug. 14, 2020) (J. Allen); *United States v. Ray*, Case No. 1:18cr177, Dkt. No. 33, at 1 (E.D. Va. Aug. 17, 2020) (J. Brinkema).[17]

---

[17] *See also United States v. Alam*, 960 F.3d 831 (6th Cir. 2020); *United States v. Somerville*, 2020 WL 2781585, at *4-5 (W.D. Pa. May 29, 2020); *United States v. Hardin*, 2020 WL 2610736, at *2 (N.D. Ohio May 22, 2020); *United States v. Griggs*, No. 4:18-cr-00216, 2020 WL 2614867, at *5 (D.S.C. May 22, 2020); *United States v. Cantatore*, No. 16-0189, 2020 WL 2611536, at *2 n.3 (D.N.J. May 21, 2020); *United States v. Schafer*, No. 6:18-CR-06152, 2020 WL 2519726 (W.D.N.Y. May 18, 2020); *United States v. Washington*, 2:07-cr-00258-CMR, ECF 529, at 3 (E.D. Pa. May 14, 2020); *United States v. Jenkins*, 2020 WL 2466911, at *4 (D. Colo. May 8, 2020); *United States v. Bazzle*, 2:11-cr-00074-BMS, ECF 84 at 1 n.1 (E.D. Pa. May 5, 2020); *United States v. Fields*, No. 3:12-cr-00022, Dkt. No. 223 (D. Alaska May 6, 2020) ("Numerous courts have found that a defendant satisfies the exhaustion requirement simply by making a formal initial request and allowing thirty days to elapse prior to filing suit, even where the warden denies the request within thirty days."); *United States v. Amarrah*, 2020 WL 2220008, at *4 (May 7, 2020); *United States v. Ardila*, 2020 WL 2097736, at *1 (D. Conn. May 1, 2020); *United States v. Robinson*, 2020 WL 1982872, at *2 (N.D. Cal. Apr. 27, 2020); *United States v. Soto*, No. 1:18-cr-10086-IT, 2020 WL 1905323, at *4 (D. Mass. Apr. 17, 2020); *United States v. Norris*, 3:17-cr-00106-SRU, ECF 119 at 2 (D. Conn. Apr. 16, 2020); *United States v. Haney*, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020) ("Rather, it requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of the facility before filing a motion."); *United States v. Kriglstein*, Case No. 1:16cr663, Dkt. No. 55 (D.N.M. Apr. 23, 2020) (same); *United States v. Spears*, 2019 WL 5190877, at *1, *3 (D. Or. Oct. 15, 2019) (a defendant can file after 30 days without exhaustion); *United States v. York*, 2019 WL 3241166 (E.D. Tenn. July 18, 2019).

The government has also conceded the same numerous times.  *See, e.g.*, United States' Response Opposing Defendant's Motion for Compassionate Release, *United States v. Smith*, No. 2:18cr96, Dkt. No. 37 at 12, n.5 (E.D. Va. Apr. 17, 2020) (conceding that "if the BOP rejects the request or takes no action within the 30 day window, the inmate is then free to press her position in the appropriate federal court"); United States' Response in Opposition to Defendant's Motion for Compassionate Release, *United States v. Zayas*, No. 1:19cr297, Dkt. No. 22 at 10-11 (E.D. Va. June 14, 2020) (same).  Moreover, it is the "official position of the Department of Justice and the Bureau of Prisons [that]: a defendant can file a motion for compassionate release in district court 30 days after requesting relief from the Warden, even if the Warden denies the relief within 30 days."[18]

The language of the compassionate release statute and the Program Statement issued by the BOP itself also support this interpretation.  *See* 18 U.S.C. 3582(c)(1)(A). A petitioner may bring a motion to modify her sentence "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or*

---

[18] *See* Gov't Supplemental Response to Def. Mtn. for Compassionate Release, *United States v. Andre Woodson,* 1:13-cr-20180-CMA, ECF No. 402 at 2 (S.D.Fl. June 5, 2020); *see also* Brief for the United States*, United States v. Alam*, 20-1298, at 24 (6th Cir. Apr. 16, 2020); Brief of the United States, *United States v. Millage*, 20-30086, at 14 n. 14 (9th Cir. Apr. 24, 2020); Government Response, *United States v. Stephens*, 3:10-cr-00210-WHR, at 8 (S.D. Oh. May 6, 2020); Govt Opposition, *United States v. Carter*, 1:16-cr-00156-TSC, at 16 n. 9 (D.D.C. May 4, 2020); Government's Letter, *United States v. Meli*, 1:17-cr-00127-KMW (S.D.N.Y May 1, 2020); Govt Response, *United States v. Robinson*, 3:18-cr-00597-RS, at 3 (N.D. Cal. Apr. 24, 2020); Answer, *Wilson v. Williams*, 4:20-cv-00794-JG, ECF 10, at 12-13, ECR 10-2 at ¶5 (N.D. Oh. Apr. 17, 2020).

As the government has noted, the Bureau of Prison's website states as follows: "[U]nder the FSA, an inmate may now file a motion for compassionate release directly with the sentencing court 30 days after making a request to the BOP or after exhausting their administrative remedies." *See* BOP website at https://www.bop.gov/inmates/fsa/faq.jsp#fsa_compassionate_release (under First Step Act: Frequently Asked Questions, Fed. Bureau of Prisons (accessed June 5, 2020)).

*the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier.*") (emphasis added); U.S. Dept. of Justice, Fed. Bur. of Prisons, Program Statement 5050.50 (Jan. 19, 2020) ("Under 18 U.S.C. § 3582(c)(1), an inmate may file a request for a reduction in sentence with the sentencing court after receiving a BP-11 response under subparagraph (a), the denial from the General Counsel under subparagraph (d), *or the lapse of 30 days from the receipt of such a request by the Warden of the inmate's facility, whichever is earlier.*") (emphasis added).  Accordingly, Ms. Friend has satisfied the exhaustion requirement contained in 18 U.S.C. § 3582(c), and her motion is ripe for review.

## II.     The Court Has Statutory Authority to Decide Whether "Extraordinary and Compelling Reasons" Exist.

This Court has the authority to order Ms. Friend's immediate release.  Section 3582(c)(1)(A)(i) states in relevant part that the Court "may reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]"

When enacting § 3582(c) as part of the Crime Control Act of 1984, Congress tasked the Sentencing Commission with defining the phase "extraordinary and compelling," and also required that any judicial order modifying a sentence be "consistent with applicable policy statements" issued by the Sentencing Commission. *See* 28 U.S.C. § 994(t).  The Sentencing Commission followed the directive and issued a policy statement, but that policy statement has not been updated to reflect changes made by the First Step Act of 2018.[19]

---

[19] Since the passage of the First Step Act, there have not been enough commissioners to update the Commission's policies or amend the Sentencing Guidelines. *See United States v.*

The Commission's current policy statement further sets forth the following factual considerations for determining whether compassionate release is appropriate: (i) the medical condition of the defendant (including terminal illness and other serious conditions and impairments); (ii) the age of the defendant (for those 65 and older with serious deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment); (iii) the family circumstances of the defendant (where a child's caregiver or spouse dies or becomes incapacitated without an alternative caregiver); and (iv) "other reasons" as determined by the BOP.  U.S.S.G. § 1B1.13, Application Note 1(A).  The fourth category specifically includes "an extraordinary and compelling reason other than, or in combination with," the first three.  *Id*.[20]

It is the Courts' role to determine what "other reasons" warrant compassionate release, notwithstanding the Commission's outdated policy statement that provided for BOP to make that determination.  "Under the First Step Act, it is for the court, not the Director of the Bureau of Prisons, to determine whether there is an 'extraordinary and compelling reason' to reduce a sentence." *United States v. Maumau,* 2:08-cr-758-TC, 2020 WL 806121, at \*7-8 (D. Utah Feb. 18, 2020).  Numerous courts have recognized the judicial authority to find that compassionate release is warranted for "other reasons" than those set forth in U.S.S.G. § 1B1.13.  *See, e.g.*, *United States v. Redd*, Case No. 1:97-cr-00006-AJT, 2020 WL 1248493, at \*8 (E.D. Va. Mar.

---

*Brown*, No. 4:05-CR-00227-1, 2019 WL 4942051 at \*2 n.1 (S.D. Iowa Oct. 8, 2019) ("As district courts have noted often this year, the Sentencing Commission has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners.").

[20] Additionally, the commentary makes clear that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."  U.S.S.G. § 1B1.13, Application Note 2.  In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction."  *Id.*

16, 2020) ("[T]he Court joins other courts in concluding that a court may find, independent of

any motion, determination or recommendation by the BOP Director, that extraordinary and

compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. §

1B1.13 cmt. n.1(A)-(C)").[21]

Not only can the Court exercise its discretion to determine that "other reasons" amount to

"extraordinary and compelling reasons" under U.S.S.G. § 1B1.13, App. Note 1(D), the "catchall

provision," but another provision of the Guidelines calls for release in this case as well.  Ms.

Friend, who is 69 and black, suffers from severe obesity, hyperlipidemia, and hypertension.[22]

Accordingly, as the government has conceded in other jurisdictions (see below), Ms. Friend is

"suffering from a serious physical or medical condition" . . . "that substantially diminishes the

ability of the defendant to provide self-care within the environment of the correctional facility

and from which he or she is not expected to recover."  U.S.S.G. § 1B1.13, App. Note 1(A)(ii)(1).

Therefore, Ms. Friend's compassionate release is predicated upon her medical condition, *see*

U.S.S.G. § 1B1.13, App. Note 1(A)(ii)(1), in addition to "other reasons" to be determined by this

Court, *see* U.S.S.G. § 1B1.13, App. Note 1(D).

---

[21] *See also United States v. Perdigao*, No. 07-103, 2020 WL 1672322, at *2 (E.D. La. Apr. 2, 2020) ("Many courts have concluded that . . . the Sentencing Commission does not have a policy position applicable to motions for compassionate release filed by defendants pursuant to the First Step Act."; *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331,  at *1 (E.D. Pa. Apr. 1, 2020) ("'the scope of the old policy statement is clearly outdated and, at the very least, does not apply to the entire field of post-First Step Act motions . . . . Therefore, the policy statement may provide 'helpful guidance' but does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i).'''); *United States v. Cantu-Rivera*, No. H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect." (internal citation omitted).

[22] Ms. Friend's medical records are attached as Exhibit B. The relevant reference here is Ex. B at 38.

**III.    There Are Extraordinary and Compelling Reasons for Release in this Case.**

    A.    <u>Ms. Friend's age and health conditions place her at high risk of serious COVID-19 complications.</u>

Ms. Friend is 69 and suffers from severe obesity, hyperlipidemia (high cholesterol), and hypertension.[23] She has already had COVID-19, and is still experiencing lingering symptoms like a cough and headache. She has also been experiencing numbness in her leg and is having difficulty walking.

On July 17, 2020, the CDC modified its guidelines to reflect changing research pertaining to COVID-19.  According to the CDC, the following groups are at increased risk for severe illness or death: (1) older adults; and (2) people with certain medical conditions.  The risk for severe illness from COVID-19 increases with age, with older adults at the highest risk.  Eight out of ten COVID-19-related deaths reported in the United States have been among adults aged 65 years and older.  People with the following medical conditions are at increased risk: (1) cancer; (2) chronic kidney disease (not necessarily requiring dialysis); (3) chronic obstructive pulmonary disease (COPD); (4) immunocompromised state from a solid organ transplant; (5) obesity (body mass index [BMI] of 30 or higher); (6) serious heart conditions, such as heart failure, coronary artery disease, and cardiomyopathies; (7) sickle cell disease; and (8) Type 2 diabetes mellitus.[24]

According to ever-developing data and research, people with the following conditions and/or risk factors may also face an increased risk: (1) asthma (moderate to severe); (2) cerebrovascular disease; (3) cystic fibrosis; (4) hypertension or high blood pressure; (5) immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV,

---

[23] Ex. B at 38.
[24] *See* CDC, *People at Increased Risk for Severe Illness*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html.

use of corticosteroids, or use of other immune weakening medicines; (6) neurologic conditions, such as dementia; (7) liver disease; (8) pregnancy; (9) pulmonary fibrosis (having damaged or scarred lung tissues); (10) smoking; (11) thalassemia (a type of blood disorder); and (12) Type 1 diabetes mellitus.[25]

The CDC has also recognized that the following groups need extra precautions: (1) racial and ethnic minority groups; (2) people living in rural communities; (3) people experiencing homelessness; (4) those who are pregnant and/or breastfeeding; (5) people with disabilities; and (6) people with developmental and behavioral disorders.[26]  Regarding racial and ethnic minorities, non-Hispanic black persons experience hospitalization or death at a rate approximately five times that of non-Hispanic white persons.  Hispanic or Latino persons have a rate approximately four times that of non-Hispanic white persons.[27]

Ms. Friend has numerous risk factors as a black 69-year-old woman with severe obesity, hypertension, and high cholesterol.  There is strong evidence that Ms. Friend's age and severe obesity put her at risk of severe illness from COVID-19, a risk that has not been shown to diminish for her having contracted the disease already.[28] For instance, a study by Kaiser Permanente, released in August, found that "[s]evere obesity puts those with coronavirus disease 2019 (COVID-19) at particularly high risk of death, more so than related risk factors such as

---

[25] *Id.*

[26] *See* CDC, *People Who Need to Take Extra Precautions*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html.

[27] *Id.*

[28] CDC, "Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19," updated 6 October, 2020, available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html (last accessed Oct. 23, 2020).

diabetes or hypertension."[29] The study noted that obesity is a particularly high risk factor for younger people, but only because as people age, other comorbidities catch up to obesity in the danger that they present. As a Johns Hopkins cardiologist associated with the study wrote, "[n]ot only does being severely obese make it harder to breathe, but the adipose tissue fuels mechanisms that act like magnets for SARS-CoV-2, the virus that causes the COVID-19… [i]t requires more muscle force to displace the diaphragm downward when a substantial fat mass lies below it. Abdominal obesity also makes it more difficult to breathe in a prone position that is favored to improve ventilation in patients with COVID-19."[30] Another study in the International Journal of Obesity noted that being overweight and severe obesity are "the most commonly reported health conditions that predispose individuals with SARS-CoV-2 infection to require hospitalization including intensive care unit admissions."[31]

The Department of Justice has issued internal guidance directing the government to concede that defendants with CDC-identified risk factors can establish "extraordinary and compelling reasons" warranting compassionate release.  For this reason, the government has conceded in numerous cases that a defendant presents "extraordinary and compelling" reasons for release where he or she has at least one risk factor recognized by the CDC, even if that

---

[29] Mary Caffrey, "Kaiser Study: Severe Obesity Boosts Risk of COVID-19 Death, Especially for the Young," American Journal of Managed Care, 12 August 2020, available at: https://www.ajmc.com/view/kaiser-severe-obesity-boosts-risk-of-covid-19-death-especially-for-the-young.
[30] *Id.*
[31] Candida J. Rebello, et al., "Obesity, the most common comorbidity in SARS-CoV-2: is leptin the link?" International Journal of Obesity, 44, 1810–1817, September 2020, available at: https://doi.org/10.1038/s41366-020-0640-5.

typically would not be enough during ordinary times.  *See United States v. Firebaugh*,

1:16cr20341, ECF No. 43 (S.D. Fla. Jun. 1, 2020).[32]

---

[32] *See also* Gov't Suppl. Resp., *United States v. Lint*, No. 18-CR-5152-BHS, ECF No. 63 at 2 (W.D. Wash. June 30, 2020)(Despite no reported Covid-19 cases at FPC Sheridan, "[t]he United States now concedes that this Court may consider Lint's conditions [COPD and obesity] as a 'extraordinary and compelling' reason for relief under the statute because his conditions impact the ability of the defendant to provide self-care within the environment of a correctional institution."); Gov't Resp., *United States v. Boykin*, No. 14-cr-201 (EGS), ECF No. 51 at 13 (D.D.C. June 11, 2020)(Despite no reported cases at Rivers CI at the time of the response, "[t]he government agree[d] that [Defendant's obesity] presents 'a serious physical or mental condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility,' § 1B1.13, cmt. n.1(A), because defendant's ability to provide self-care against serious illness from COVID-19 at his facility is substantially diminished by the condition itself."); Amended Gov't Resp., *United States v. Hernandez*, No. 04-cr-171, ECF No. 109 at 1-2 (E.D. Wisc. June 9, 2020)("Consistent with the [DOJ's] litigating position in compassionate-release motions during the COVID-19 pandemic, the government concedes that Hernandez's type II diabetes diagnosis is sufficient to satisfy the "extraordinary and compelling" standard in USSG § 1B1.13, cmt. n.1(A)," despite no reported cases at Pekin FCI at the time of response.); Government's Response, *United States v. Feucht*, 0:11-cr-60025, ECF 51 (S.D. Fla. May, 26, 2020) ("The Government acknowledges that during the current COVID-19 pandemic, an inmate who presents one of the CDC risk factors, which include diabetes, as confirmed by medical records, and who is not expected to recover from that condition, presents an extraordinary and compelling reason that would allow compassionate release under the statute and guideline policy statement, even if that condition in ordinary times would not allow compassionate release."); Government's Response, *United States v. Washington*, 4:04-cr-02090-DCB-HCE, ECF 484 (D. Az. May 22, 2020) ("If an inmate has a chronic medical condition that has been identified by the Centers for Disease Control (CDC) as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition may satisfy the standard of 'extraordinary and compelling reasons'. . . . Here, the government concedes that the defendant's terminal liver disease is one of the medical conditions identified by the CDC as elevating an inmate's inability to provide self-care within the environment of a correctional facility during the COVID-19 outbreak."); Gov't Resp., *United States v. Faafiu*, No. 3:17-cr-231, ECF No. 67 at 8 (N.D. Cal. May 20, 2020)("Given the current pandemic and the likelihood that if Defendant contracted COVID-19, he would potentially suffer severe symptoms due to his personal health characteristics"—being 25 years old, overweight, and suffering from sleep apnea and hypertension—"the government does not contest that defendant presents an extraordinary and compelling reason, as required under USSG § 1B1.13, cmt. n.1(A)," despite no reported infections at the time at USP Atwater.); Government's Response, *United States v. Hird*, 2:13-cr-0039-TJS, ECF 650 (E.D. Pa. May 19, 2020) ("The government acknowledges that the risk of COVID-19 presents 'a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility,' as stated in note 1(A), as, due to his comorbidities, the defendant may be less able to protect himself against an unfavorable outcome from the disease."); Letter Amending Government's Response,

In *Firebaugh*, for instance, the defendant suffered from COPD and diabetes.  In light of the pandemic, the government conceded that he had "extraordinary and compelling reasons" for release, not under the U.S.S.G. § 1B1.13, App. Note 1(D)—the "catchall provision''—but under U.S.S.G. § 1B1.13, App. Note 1(A)(ii)(I)—because he was suffering from a "serious physical or medical condition(s) . . . that substantially diminished the ability of the defendant to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover."  The government further conceded that "by having COPD and diabetes (CDC risk factors), [the defendant] has established the requisite 'medical condition' under USSG § 1B1.13, cmt. n.1(A)," even though "there are no known infections of staff or inmates at [FCI Petersburg]."  *Id*. at *2-3.

Ms. Friend suffers from multiple chronic conditions specifically identified on the two CDC lists, including severe obesity, hyperlipidemia, and hypertension.[33]  Under U.S.S.G. §

---

*United States v. Wise*, 1:18-cr-00072-ELH, ECF 185 (D. Md. May 18, 2020) ("consistent with current DOJ policy, the Government does not contest the Defendant's eligibility for being considered for compassionate release in this case because he suffers from a condition identified by the CDC as putting him at higher risk for severe illness."); Supplemental Response, *United States v. Wright*, 8:17-cr-00388-TDC, ECF 50 (D. Md, May 19, 2020) ("the Government concedes that the defendant's Type I diabetes, and perhaps other of her medical conditions, constitute 'extraordinary and compelling circumstances' during the pandemic, even if these conditions in ordinary times would not allow compassionate release."); Government's Response, *United States v. Blystone*, 5:14-cr-00172-DAE, ECF 518 (W.D. Tex. May 14, 2020) ("Under the fact-specific circumstances of this case, the government does not dispute that Defendant has met the threshold requirement of showing 'extraordinary and compelling reasons' favoring release, § 3582(c)(1)(A)(i). Defendant's medical records show that she is severely obese, with a Body Mass Index exceeding 40. Although that condition would ordinarily be insufficient to establish an 'extraordinary and compelling reason' for release, it has been identified by the CDC as elevating her risk of becoming seriously ill from COVID-19."); *United States v. Pabon*, --F. Supp. 3d--, 2020 WL 2112265, at *3-4 (E.D. Pa. May 4, 2020)( "[T]he government concedes that Mr. Pabon's serious medical conditions [including diabetes and hypertension, among others] qualify as one of the enumerated 'extraordinary and compelling reasons' under the policy statement [USSG § 1B1.13, cmt. n.1(A)]," even though "the government represents that Lewisburg Camp has no cases of COVID-19[.]").

[33] Ex. B at 38.

1B1.13, App. Note 1(A)(ii), Ms. Friend is suffering from a serious medical condition that substantially diminishes her ability to provide self-care in prison.  Ms. Friend's underlying medical conditions substantially diminish her ability to provide self-care—in this case, by protecting herself from contracting COVID-19—because of the conditions of confinement in prison.  Even the DOJ recognizes that BOP facilities cannot ensure social distancing and adequate sanitation.  If a prisoner cannot practice the recommendations issued by the CDC to protect herself from COVID-19, such as social distancing, frequent hand-washing, sanitizing surfaces, and wearing masks and gloves, then her ability to protect herself from infection is substantially diminished.  For someone like Ms. Friend, contracting COVID-19 again could be fatal.  Accordingly, she meets the "extraordinary and compelling" requirement in two ways: based on her medical conditions and under the "catchall" provision.  *See* U.S.S.G. §§ 1B1.13, App. Notes 1(A)(ii)(I) and (D).  Given the DOJ's explicit directive, the government should concede "extraordinary and compelling reasons" in this case as well.

 B. <u>The fact that Ms. Friend has contracted COVID-19 one time does not lower her future risk.</u>

Even though she has already had COVID-19, being a black 69-year-old woman with severe obesity, hypertension, and high cholesterol puts Ms. Friend at a high risk on severe illness from contracting COVID-19 again. Courts have recognized that having COVID-19 does not guarantee immunity, and that the risk of reinfection remains, granting compassionate release to individuals who have had COVID in a number of cases.[34]  For instance, in *United States v. Lee*,

---

[34] *See, e.g.*, *United States v. Hanson*, No. 6:13-CR-00378-AA-1, 2020 WL 3605845 (D. Or. July 2, 2020) (granting compassionate release to a defendant who the BOP labeled as "recovered," when there was "no indication that defendant has tested negative for COVID-19 since his initial contraction of the virus"); *United States v. Heyward*, 17-cr-00527-PWG, ECF 83, 84 (D. Md. June 30, 2020) (granting compassionate release to a defendant who has recovered from COVID-19, but is still in isolation and "the Government does not dispute, that a secondary

contraction of COVID-19 is possible"); *United States v. Yellin*, No. 3:15-CR-3181-BTM-1, 2020
WL 3488738, at *3 (S.D. Cal. June 26, 2020) (granting compassionate release to a defendant
who tested positive after several court hearings and did not develop severe symptoms because
"the possibility of reinfection persists" and citing the death of Adrian Solarazano as "an example
of at least one inmate dying from COVID-19 after Terminal Island deemed him recovered from
the virus"); *United States v. Gaitan*, No. 18-CR-4662-BAS-1, 2020 WL 3469395 (S.D. Cal. June
25, 2020) (granting compassionate release to a 30-year-old defendant with arrhythmia and a
defibrillator to manage his heart rate who contracted COVID-19 and suffered two cardiac arrests
as a result); *United States v. Fleming*, 2:17-cr-00362-AB (C.D.Cal. Jun. 24, 2020) (granting
motion to COVID-positive defendant who BOP deemed recovered); *United States v. Schaffer*,
13-cr-00220-MMC, ECF 40 (N.D Cal. June 24, 2020) (granting compassionate release to a
defendant who recovered from COVID-19, noting "the scientific community has not, as of this
date, determined whether a prior infection produces immunity or affects the severity of any
potential subsequent infection"); *United States v. Davis*, 2020 WL 3443400 (E.D. Cal. Jun. 23,
2020) (granting motion over government argument that motion was moot because defendant had
already contracted COVID-19); *United States v. Common*, No. 17-cr-30067, 2020 WL 3412233
(C.D. Ill. June 22, 2020) (granting compassionate release to a defendant who already had
COVID-19, highlighting that the World Health Organization warned that "the public belief that a
one-time infection leads to immunity remains unproven and is unreliable as a basis for response
to the pandemic"); *United States v. Cruz*, No. 3:17-CR-00075-JO-4, 2020 WL 3265390 (D. Or.
June 17, 2020) (granting relief to a defendant who had a mild case and had apparently
recovered"); *United States v. Kess*, No. ELH-14-0480, ECF No. 57 at 11-13 (D. Md. June 17,
2020) (granting compassionate release to a 42-year-old defendant deemed a Career Offender at
sentencing and who "recovered," without actually being tested, from COVID-19); *United States
v. Liew*, No. 11-CR-00573-JSW-1, 2020 WL 3246331 (N.D. Cal. June 15, 2020) (granting
compassionate release to a defendant with a fatty liver and high cholesterol and who was
hospitalized, but stabilized, from COVID-19); *United States v. Halliburton*, No. 17-CR-20028,
2020 WL 3100089 (C.D. Ill. June 11, 2020) (granting compassionate release to a 42-year-old
defendant with asthma, obesity, and COVID-19: "based on the currently available scientific data,
Defendant continues to be at risk of imminent harm based on his underlying medical
conditions"); *United States v. Williams*, No. PWG-19-0134, ECF No. 70 at 7 (D. Md. June 10,
2020) (granting compassionate release to a defendant with obesity and who appeared to be
recovered from COVID-19 and had been released back into the general inmate population);
*United States v. Parramore*, No. CR18-156-RSM, 2020 WL 3051300 (W.D. Wash. June 8,
2020) (granting compassionate release to COVID-positive defendant whose glaucoma was
neglected in wake of COVID pandemic); *United States v. Snell*, No. CR 16-20222-6, 2020 WL
2850038 (E.D. Mich. June 2, 2020) (granting compassionate release to a defendant who tested
COVID positive in April because of the ongoing strain on his access to medical care); *United
States v. McCall,* 2:18-cr-95-MHT, ECF 96 (M.D. Alabama Jun 4, 2020) (granting
compassionate release, after an evidentiary hearing, to a defendant with sickle-cell anemia who
had tested positive, ordering release to sister who would take him immediately to hospital);
*United States v. Brown*, 2:18-cr-360, ECF 35 (N.D. Ala. May 22, 2020) (finding deteriorating
medical condition after positive COVID-19 diagnosis and risk of inadequate medical care
constituted "extraordinary and compelling" circumstances); *United States v. Alvarez- Tostado*,
98-cr-508-GW, ECF 691 (C.D. Cal. May 20, 2020) (granting compassionate release over

this court granted compassionate release to an asymptomatic 46-year-old defendant who had

diabetes, hypertension, hyperlipidemia, and a family history of heart disease, who had already

contracted COVID-19.[35] There is at least one case of a BOP inmate who died from COVID-19

---

government's argument that defendant's COVID-positive status rendered request moot); *United States v. Sholler*, No. 17-CR-00181-SI-1, 2020 WL 2512416 (N.D. Cal. May 15, 2020) (granting release to defendant who was determined to be "recovered" from COVID-19 because "[t]he parties agree that it remains unclear whether recovering from COVID-19 renders one immune from new infection"); *United States v. Arreola-Bretado*, 3:19-cr-3410, ECF 50 (S.D. Cal. May 15, 2020) (granting compassionate release to defendant who tested positive for COVID-19 after concluding she will receive superior medical care outside of the custody of the Otay Mesa detention facility); United States v. Barber, No. 6:18-cr-00446-AA, 2020 WL 2404679 (D. Or. May 12, 2020) (granting compassionate release to a defendant who tested positive for COVID-19); *United States v. Fischman*, 16-cr-00246-HSG-1, ECF 76 (N.D. Cal. May 1, 2020) (granting compassionate release from Terminal Island to COVID-19-positive defendant); *United States v. Kriglstein*, 1:16-cr-00663-JCH-1, ECF 60 (D.N.M. Apr. 27, 2020) (staying for 5 days release of defendant who was tested for COVID-19 as condition of order granting compassionate release, with positive result); *United States v. Huntley*, 13-cr-119-ABJ, ECF 263, at 8 n.9, 10 (D.D.C. May 5, 2020) (ordering compassionate release for defendant who tested positive for COVID-19 while motion was being litigated); *Yeury J.S. v. Decker*, 2:20-cv-5071-KM, ECF 20 (D.N.J. May 11, 2020) (ordering release for COVID-19-positive immigration detainee); *United States v. Johnson*, No. 1:17-cr-00482-JSR-1, Dkt. No. 116 (S.D. N.Y. May 1, 2020) (urging the BOP to set a release date for a defendant who contracted COVID); See, e.g., *United States v. Malufau*, No. 1:13-cr-00860-LEK (D. Haw. July 22, 2020) (granting motion to defendant who had been hospitalized with covid-19 then released); *United States v. Garrison*, 11- cr-0922-FMO (C.D. Cal. Jul. 8, 2020) (granting motion to COVID-positive defendant with stage III kidney disease; *United States v. Carter*, No. 16-cr-156, at *1 (D.D.C. June 10, 2020) (granting sentence reduction for 76-year old sex offender having served 48-months of 80-month sentence and who had tested positive, was asymptomatic, "no other documented health issues," and noting inmate was at "heightened risk of developing serious complications should he be exposed again," and if released, inmate "will be able to more effectively avoid contracting COVID-19"); *United States v. Jacobs*, No. 19-cr-149, ECF No. 84 (S.D. Ia. July 2, 2020) (defendant tested positive and has been treated with "Tylenol and sequestration," continues to test positive a month later, and is granted 3582 sentence reduction while still held at county jail); *United States v. Plank*, No. 17-cr-20026, at *5-6 (D. Kan. July 2, 2020) (noting "despite the BOP's measures" over "one-third of the population has been infected" at Forrest City, and finds that despite being COVID-positive, "the risk to defendant remains, as it has not been established that a person becomes completely immune to the virus after infection"); *United States v. Lipp*, No. 17-cr-40057 (D. Kan. July 29, 2020) (inmate already "contracted COVID-19 . . . which caused him to be hospitalized," and "[a]lthough he has recovered, health concerns remain").

[35] *United States v. Lee*, No. 1:95-cr-00058-LMB-1, 2020 WL 3422772 (E.D. Va. June 22, 2020).

after having "recovered" from the virus at FCI Terminal Island. In that case, the inmate, Adrian Solarzano, had long-term, pre-existing medical conditions recognized by the CDC as putting him at risk of severe illness from COVID-19. He was considered recovered from the virus but within weeks fell ill again and died a few days later.[36]

Health organizations and the scientific community have emphasized that there is not enough evidence to show that previous infection with the virus leads to immunity. For example, the World Health Organization (WHO) issued a scientific brief saying that the public belief that a one-time infection leads to immunity remains unproven and is unreliable as a basis for response to the pandemic.[37] The WHO specifically stated that "[t]here is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection."[38]

There are numerous examples of reinfection. For example, thirteen United States sailors from the USS Theodore Roosevelt who had apparently recovered from the coronavirus, went through rigorous recovery criteria that exceeded CDC guidelines, and had received negative test results, tested positive for the disease a second time.[39] Research on four endemic coronaviruses, though not the exact virus that causes COVID-19, by the Columbia University Mailman School

---

[36] Eric Licas, "9th coronavirus-related death reported at Terminal Island federal prison," Daily Breeze, May 27, 2020, available at: https://www.dailybreeze.com/2020/05/27/9th-coronavirus-related-death-at-terminal-island-federal-prison/

[37] World Health Organization, "'Immunity passports' in the context of COVID-19," 24 April 2020, available at: https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19 (last accessed Oct. 23, 2020).

[38] *Id.*

[39] Geoff Ziezulewicz, "13 Theodore Roosevelt sailors re-test positive for coronavirus," Navy Times, 13 May, 2020, available at: https://www.navytimes.com/news/your-navy/2020/05/15/five-theodore-roosevelt-sailors-re-test-positive-for-covid-19/#:~:text=Five%20sailors%20from%20the%20embattled,tested%20positive%20again%20on%20Saturday.

of Public Health has found that "[t]he evidence from endemic coronaviruses suggests that immunity is short-lived and re-infection is common within one year."[40] The study further found that when reinfection occurred, it was not associated with less severe symptoms.[41] Given the large number of confirmed cases of COVID-19 at FCI Waseca and based on the currently available scientific data, Ms. Friend continues to be at risk of imminent harm based on her underlying medical conditions.

In addition to the risk of relapse or reinfection, Ms. Friend also may suffer long-term side effects from COVID-19 that require more intensive hospital care. Historical research on other coronaviruses like severe acute respiratory syndrome (SARS) and Middle East respiratory syndrome (MERS), suggests that for some people affected by COVID-19, a full recovery may not happen for years, if at all.[42] Other studies from China indicate that permanent lung damage

---

[40] Columbia University Mailman School of Public Health, "Risk of Coronavirus Reinfection Remains After Recovery," 29 April, 2020 available at https://www.publichealth.columbia.edu/public-health-now/news/risk-coronavirus-reinfection-remains-after-recovery (last accessed on Oct. 23, 2020).

[41] *Id*.

[42] *See, e.g.,* Madjid et al., "Potential Effects of Coronaviruses on the Cardiovascular System: A Review," Jama Cardiology, American Medical Association, July 2020,  available at: https://jamanetwork.com/journals/jamacardiology/fullarticle/2763846 (suggesting that COVID-19 may cause lingering cardiac damage, as well as making existing cardiovascular problems worse, further increasing the risk for heart attack and stroke); Panagis Galiatsatos, "What Coronavirus Does to the Lungs," Johns Hopkins Medicine, 13 April 2020, available at: https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/what-coronavirus-does-to-the-lungs (suggesting that disease severity, pre-existing health conditions, and quality of treatment affect the potential for long-term lung damage from coronavirus); Michael Marshall, "The lasting misery of coronavirus long-haulers," Nature, 14 September 2020, available at: https://www.nature.com/articles/d41586-020-02598-6 ("People with more severe infections might experience long-term damage not just in their lungs, but in their heart, immune system, brain and elsewhere. Evidence from previous coronavirus outbreaks, especially the severe acute respiratory syndrome (SARS) epidemic, suggests that these effects can last for years.")

can be found in anywhere from 77 to 95 percent of COVID-19 survivors.[43] For someone like Ms. Friend, who is 69 and has several comorbidities, including severe obesity, hypertension, and hyperlipidemia, the possibility of reinfection presents a very real and immediate danger.

    C.   <u>COVID-19 Is Present at Ms. Friend's Facility.</u>

The Court is undoubtedly familiar with the threat posed by COVID-19, particularly in the prison setting, where social distancing and hygiene recommended by the CDC are very difficult to achieve. As the Supreme Court has noted, "[j]ails are often crowded, unsanitary, and dangerous places." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 333 (2012). Accordingly, "[t]he danger of introducing . . . contagious infections, for example, is well documented." *Id*. at 330-31.  Not surprisingly, COVID-19 is tearing through the BOP at a rate exponentially higher than it is spreading elsewhere in the United States. Indeed, test results show that up to 70% of inmates in BOP facilities *that have been tested* have tested positive for COVID-19.[44]

This is because conditions of confinement create the ideal environment for the transmission of contagious disease.[45]  "Prisons are petri dishes for contagious respiratory illnesses."[46]  Inmates cycle in and out of jails and prisons, and people who work in the facilities

---

[43] Wang et al., "Temporal Changes of CT Findings in 90 Patients with COVID-19 Pneumonia: A Longitudinal Study," Radiological Society of North America, 19 March 2020, available at https://pubs.rsna.org/doi/full/10.1148/radiol.2020200843.

[44] https://www.nytimes.com/aponline/2020/04/30/us/politics/ap-us-virus-outbreak-federalprisons.html ("And even though officials have stressed infection and death rates inside prisons are lower compared with outside, new figures provided by the Bureau of Prisons show that out of 2,700 tests systemwide, nearly 2,000 have come back positive, strongly suggesting there are far more COVID-19 cases left uncovered.")

[45] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521310.

[46] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

leave and return daily.  According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[47]  The conditions of confinement not only affect incarcerated individuals, but also the community at large.  "With 2.3 million people in the United States in prison or jail on any given day, an outbreak in these facilities poses a threat to the entire country."[48]

It is impossible to know how pervasive the spread of the virus is unless the BOP conducts widespread testing. As one court noted, "[t]his disease spreads asymptomatically, which means the Court and the prison system can take no comfort in a [small number] of confirmed cases, and all parties should be deeply concerned by the lack of universal testing of inmates and staff." *United States v. Amarrah*, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020); *see also United States v. Blye*, No. 1:15CR348 at 8 (WD. Wash. June 9, 2020) (releasing defendant of advanced age and health issues: "The Court appreciates the fact that there have been no confirmed cases of COVID-19 at FDC-Sea-Tac. However, this representation is made without the benefit of mass testing or even the benefit of the numbers tested. It appears we have no accurate accounting of the presence or absence of the disease at the institution. . .[G]iven the risks, it makes little sense to wait for such an outbreak before considering defendant's request for health-based compassionate release").

---

[47] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[48] *Explainer: Prisons and Jails Are Particularly Vulnerable to COVID)-19 Outbreaks*, The Justice Collaborative, available at https://thejusticecollaborative.com/wpcontent/uploads/2020/03/TJCVulnerabilityofPrisonsandJailstoCOVID19Explainer.pdf.

The fact remains that the virus is present at FCI Waseca.   As of October 18, 2020, the

DOJ Office of the Inspector General website on COVID-19 in the BOP reports that there are 23

active cases of COVID-19 at the facility, in addition to 435 cases of inmates who have

"recovered" and 3 cases of staff members who have "recovered."[49]   That means a full 76% of the

inmates at FCI Waseca have tested positive for COVID-19, making FCI Waseca the 12th worst

outbreak of COVID-19 in the BOP system.[50] Furthermore, infections began in late July/early

August 2020, well after the BOP started its programs aimed at containing the spread of COVID-

19.[51] Regardless of the BOP's best efforts, the infection rate at FCI Waseca itself is an

astonishing 29 times the infection rate in the general population.[52] "By now, the five largest

known clusters of the virus in the United States are not at nursing homes or meatpacking plants,

but inside correctional institutions."[53]   Unfortunately, the numbers are not improving quickly: 58

inmates and 2 staff have died since May.[54]

---

[49] Department of Justice, Office of the Inspector General, "Facility-Level BOP COVID-19 Trends, FCI Waseca," as of 18 October 2020, available at:
https://www.arcgis.com/apps/MapSeries/index.html?appid=a3e98be1aab94eadaaeaa96ed176f418 (last accessed Oct. 25, 2020).

[50] That is assuming a total population of 598 inmates at FCI Waseca. Federal Bureau of Prisons, "FCI Waseca" available at: https://www.bop.gov/locations/institutions/was/ (last accessed Oct. 25, 2020); Federal Bureau of Prisons, "COVID-19 Coronavirus" available at https://www.bop.gov/coronavirus/ (last accessed October 25, 2020).

[51] Department of Justice, Office of the Inspector General, "Facility-Level BOP COVID-19 Trends, FCI Waseca," as of 18 October 2020, available at:
https://www.arcgis.com/apps/MapSeries/index.html?appid=a3e98be1aab94eadaaeaa96ed176f418 (last accessed Oct. 25, 2020).

[52] This is assuming a U.S. population of 328 million and a total of 8.632 million cases in the United States. Johns Hopkins University, "COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins," available at https://coronavirus.jhu.edu/map.html (last accessed October 25, 2020).

[53] Timothy Williams, "Coronavirus Cases Rise Sharply in Prison Even as they Plateau Nationwide," New York Times (June 16, 2020)
https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisonsjails

[54] Department of Justice, Office of the Inspector General, "BOP and COVID-19 at a Glance," as of October 18, 2020, available at

In granting compassionate release, many courts have acknowledged that vulnerable defendants like Ms. Friend are at grave risk *despite* BOP precaution. "Even in the best run prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others." *United States v. Esparza*, No. 1:07-cr-00294-BLW, 2020 WL 1696084 (D. Idaho. Apr. 7, 2020); *see also United States v. Muniz*, Case No. 4:09-cr-199, 2020 WL 1540325, at *1 (S.D. Tex. Mar. 30, 2020) ("[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers . . . demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection.").

In sum, Ms. Friend's particular susceptibility to COVID-19 while incarcerated, in combination with the mortal risk to Ms. Friend given her age and medical conditions, constitutes an extraordinary and compelling reason warranting Ms. Friend's compassionate release.  Indeed, this Court has recognized that "in the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at her prison facility."  *United States v. Feiling*, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020). Ms. Friend meets both conditions, warranting her immediate release and a sentencing reduction to time served.

## IV.   Releasing Ms. Friend is Appropriate Given Her History and Characteristics and Her Rehabilitation While Incarcerated

---

https://www.arcgis.com/apps/MapSeries/index.html?appid=a3e98be1aab94eadaaeaa96ed176f41 8.

In determining whether an individual's sentence should be reduced based on an "extraordinary and compelling reason," this Court must consider whether s/he presents a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). *See* U.S.S.G. § 1B1.13(2). Under the present statutory regime, the existence of extraordinary and compelling circumstances confers on this Court the authority to consider the relevant 18 U.S.C. § 3553(a) factors in determining whether a sentence reduction is appropriate.  Because the guidelines were mandatory when this Court originally sentenced Ms. Friend, the Court was required to sentence her to life, regardless of the § 3553 sentencing factors.  Today the factors point to release.

A.  Ms. Friend is not a danger.

While the offenses for which Ms. Friend was convicted were violent, Ms. Friend herself committed no violent acts, and indeed was not present for the majority of the violent acts that took place. Her sons, who remain incarcerated, and their associate, were the perpetrators of the violence. It is not clear that Ms. Friend knew beforehand what would happen to the two men while they were held in their own trucks, nor that one of them would be killed.

Furthermore, Ms. Friend has no history of violence. Her prior criminal history is almost negligible, and consists only of non-violent offenses, namely reckless driving and writing bad checks.[55] She has almost no disciplinary history, and her only citation in the 21 years of her incarceration was for not obeying an order in 2009.[56] She has been rated a minimum-security risk

---

[55] Dkt. 840 at 15-16

[56] Ms. Friend's Inmate Disciplinary Data is attached as Exhibit C. The relevant citation here is Ex. C at 1.

26

and is being held at a low-security facility. She has also been rated as a low recidivism risk.[57] As an elderly woman with a high school degree, Ms. Friend is particularly unlikely to recidivate.[58]

Ms. Friend's release plan also militates against the likelihood that she recidivates. She would live with close friends who know about her bipolar disorder and have plans to ensure adequate treatment through counseling and medication. Indeed, only two months before the instant offenses were committed, Ms. Friend was formally diagnosed with bipolar disorder.[59] She had struggled with mental health issues for her entire life, but had never received adequate treatment. For instance, when she was hospitalized after a suicide attempt in the 1980's, she was given Prozac. Prozac is the only antidepressant that has a formal indication in treating bipolar disorder, but only when used in combination with antipsychotic drug Zyprexa (olanzapine), and there is evidence that antidepressants alone can trigger mania in people with bipolar disorder and worsen cycling of the disorder.[60] Ms. Friend was not given antipsychotics to use in conjunction with Prozac, and the medication did not improve her mental health. However, her release plan would involve living with her friend, Lori Watson, in her Chicago home. Not only is Ms. Watson a close friend of Ms. Friend's, but she knows about her mental health issues, and even helped her with her mental state while they were in prison together. Ms. Watson has described days in which Ms. Friend went from feeling she would have a bad day to feeling she would have a good day after talking with her. Ms. Watson and Ms. Friend have discussed plans for obtaining

---

[57] Ex. A at 1.

[58] *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, Ex. 9 (2004), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research publications/2004/200405_Recidivism_Criminal_History.pdf.

[59] Dkt. 840 at 21.

[60] Marcia Purse, "How Prozac (Fluoxetine) Is Used to Treat Bipolar Disorder," VeryWell Mind, 21 March 2020, available at: https://www.verywellmind.com/prozac-fluoxetine-side-effects-378997 (last accessed October 23, 2020).

ongoing treatment for Ms. Friend's bipolar disorder, both through counseling and medication. And Ms. Friend would also have the assistance of the probation office in obtaining any additional treatment resources that she required.

Before the turbulent period from 1997 to 1999 in which Ms. Friend left her long-term job and had a series of short stints at various employers, she had been a non-violent and law-abiding person,[61] despite an abusive marriage and undiagnosed bipolar disorder.[62] She has a high school diploma and worked for many years in the same stable job with Philip Morris.[63] With support from her community of friends, and continuing treatment for her bipolar disorder, there is no reason to think that Ms. Friend would be violent, or have any risk of recidivism.

B. The § 3553(a) factors, particularly the history and characteristics of the defendant and the need to avoid unwarranted sentencing disparities, as well as Ms. Friend's rehabilitation, weigh in favor of release.

For the last 21 years, Ms. Friend has been serving a life sentence.  Despite this, she has tried to make the most of her incarceration by participating in programming and by seeking, and receiving, consistent treatment for her bipolar disorder. As noted above, she has completed a wide range of courses, particularly in film studies.[64] She has stayed on a course of medication which she reports helps her a great deal.  She communicates regularly with friends, including two friends who were formerly incarcerated with her. She speaks or emails with her network of friends and family several times a week.

There is no doubt that Ms. Friend's prior criminal conduct was serious.  At the time, the fact that she had bipolar disorder is particularly relevant to out-of-character conduct, as the

---

[61] All of her criminal record comes from this period. Dkt. 840 at 15-16.
[62] Dkt. 840 at 19.
[63] Dkt. 840 at 21-22.
[64] Ms. Friend's inmate transcript is attached as Exhibit D.

underlying offense was for Ms. Friend, because it causes people to have a lack of appreciation for the consequences of their actions.[65] Ms. Friend was also the victim of long-term domestic violence, staying in an abusive marriage with her husband until his death in 1995 from leukemia.[66] Her abusive marriage may well have had an impact on her relationship with other people in her life, leading her to feel less in control of her relationships with others. For example, the intake coordinator at the Medical College of Virginia, who diagnosed Ms. Friend with bipolar disorder in February 1999, before the instant offenses took place, reported that she stated the following: "I want people I love to pay attention to me. They don't care about me. They just use me. I allow them to make a fool out of me. It's my fault. I allow them to do this to me."[67] Ms. Friend has since sought and received treatment while in the BOP, and has learned how to manage her disorder. Her medical records show that she attends counseling sessions and has maintained her course of medication.[68]

The court should also consider that Charlene Thomas, who had a very similar role in the offense conduct, received a sentence of 12 months' imprisonment and 3 years of supervised release.[69] Charlene Thomas was the girlfriend of Eugene Friend, Ms. Friend's oldest son. Ms. Thomas was with Ms. Friend for almost the entire course of the offense conduct, riding in the

---

[65] Kathleen Holmes, M et al. "Conceptualizing impulsivity and risk taking in bipolar disorder: importance of history of alcohol abuse." *Bipolar disorders* vol. 11,1 (2009), 33-40, available at :10.1111/j.1399-5618.2008.00657 ("Individuals with bipolar disorder (BD) tend to be impulsive and engage in risky behaviors—pleasurable activities with high potential for negative consequences. Indeed, increased risk taking is one of several diagnostic criteria for a manic episode…there is growing evidence that impulsivity is a stable trait characteristic of BD and appears to represent a core feature of the illness.")

[66] Dkt. 840 at 19.

[67] *Id*., at 21.

[68] *See, e.g*. Ex. B at 14-30.

[69] Dkt. 840 at 26.

van with her and exposing herself in order to get the victims to pull over and exit their vehicles.[70]
The behavior of the two women was very similar. However, Ms. Thomas cooperated with the
government and pled guilty to only Misprison of Felony.[71] She later gave testimony at Ms.
Friend's trial. Ms. Friend, on the other hand, refused to cooperate with the government and
refused to plead guilty in an effort to protect her sons, who were facing the death penalty.  Ms.
Friend did not want to give incriminating evidence against her sons, and worried that a guilty
plea by her could be used as evidence against her sons if they went to trial. When asked about
her sons by law enforcement, she made false statements, telling them that her sons had never
done anything worse than falling behind on child support payments.[72] While it is undoubtedly
wrong to lie to law enforcement and to hinder an investigation, Ms. Friend's desire to protect her
sons was the primary driver of that decision. Ms. Thomas undoubtedly deserved a significant
benefit for cooperating in this investigation and ensuring that Ms. Friend's sons could not repeat
the same terrible actions a third time.  But she is nonetheless comparable to Ms. Friend in her
role in the offense, but served only 12 months in prison, while Ms. Friend received a mandatory
life sentence. This Court can now address this disparity in granting compassionate release.

        The woman Ms. Friend is today is very different from the one who stood before this
Court to be sentenced in 2001.  She has been rehabilitated – taking classes and seeking treatment
for her bipolar disorder.  She has support from friends in the community. The court should
consider the effect of Ms. Friend's history of domestic abuse and mental health issues, as well as
the disparity between her sentence and Ms. Thomas' sentence for largely similar conduct, in
granting Ms. Friend's motion for relief.

---

        [70] *Id.*, at 5-9.
        [71] *Id.,* at 4.
        [72] *Id.,* at 14-15.

C.  <u>Ms. Friend Has a Viable Release Plan</u>

Each day in custody is increasingly risky for Ms. Friend, who has no way to practice "social distancing" or other protectives measures that are mandated by health officials throughout the nation and which promise some hope of surviving the consequences of infection. Ms. Friend has formulated a release plan that will adequately address the concerns presented by COVID-19, protect the public, and ensure her successful transition into the community.  As noted above, Ms. Friend will live with her friend and former cellmate, Lori Watson, who is a funeral director.[73] Ms. Watson reports that she has already prepared a room for Ms. Friend in her Chicago home.  Ms. Watson's husband and mother also live at this home and are both eager to provide additional support to Ms. Friend as she re-enters society.

Ms. Watson has worked with felons leaving prison through a waiver with the federal government, and is aware of the issues that felons can face on re-entering society. Ms. Friend would have employment in Ms. Watson's business. She would also have access to social security payments from her husband, and a pension from Philip Morris. She plans to sign up for Medicare or Medicaid in order to continue her treatment for bipolar disorder, and will have the assistance of the probation office to ensure she receives the treatment she needs.[74] Finally, Ms. Friend would also receive support from her friend Terri Edwards, who lives in Wisconsin,[75] and was also formerly incarcerated with Ms. Watson and Ms. Friend.

There is every reason to believe that Ms. Friend, who has improved in her ability to manage her bipolar disorder while in prison, would be in an even better position to manage the disorder outside of prison, where there are a far wider range of medical and counseling resources

---

[73] Dkt. 837 at 12-15.

[74] *Id.*

[75] *Id.*

31

available. The Office of Inspector General found that "recruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs."[76] Ms. Friend will have strong support from her close friends, who are aware of her mental health issues and who have already made plans for her living, treatment, and financial support.

## CONCLUSION

For the reasons above, Ms. Friend respectfully requests that this Court order her immediate compassionate release and impose the following supervised release conditions: 1) that Ms. Friend abide by the standard supervised release conditions; 2) that within 72 hours of release, Ms. Friend contact the U.S. Probation Office by phone for specific reporting instructions; 3) that Ms. Friend reside at Ms. Watson's residence in Chicago, IL.

Respectfully submitted,

Vallia Carolyn Friend

By Counsel

/s Lisa M. Lorish
Lisa M. Lorish (VSB No. 81465) [77]
University of Virginia School of Law
Federal Sentence Reduction Clinic
580 Massie Rd
Charlottesville, VA 22903
Lisa_lorish@fd.org

---

[76] U.S. Dep't of Justice, Office of the Inspector General, Review of the Federal Bureau of Prisons' Medical Staffing Challenges (2016), https://oig.justice.gov/reports/2016/e1602.pdf.
[77] Counsel is the director of the University of Virginia School of Law's Federal Sentence Reduction Clinic, and wishes to thank third-year law student Eleanor Coates for her substantial contribution to the preparation of this motion. To avoid any confusion with her ECF filing account information, Counsel also notes for the Court that she is employed as an Assistant Federal Public Defender in the Western District of Virginia.

## **CERTIFICATE OF SERVICE**

I certify that on this 29th day of October 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification (NEF) to all counsel of record.

I further certify that I sent a copy of this pleading to the probation office by way of electronic mail to: duty-vaep-richmond@vaep.uscourts.gov.

/s Lisa M. Lorish
Lisa M. Lorish (VSB No. 81465)
University of Virginia School of Law
Federal Sentence Reduction Clinic
580 Massie Rd
Charlottesville, VA 22903
Lisa_lorish@fd.org