IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 3:99-cr-201-REP |
| VALLIA FRIEND, | |
| *Defendant*. | |

**United States Response Opposing
Defendant's Motion for Compassionate Release**

Defendant Vallia Friend seeks compassionate release from her sentence of life imprisonment.  Over nearly two months, members of the Friend family murdered two truck drivers—Soren Cornforth and Samuel Lam—and permanently maimed a third, John Wesley Cummings.  *See, e.g., United States v. Friend*, 755 F. App'x 234, 236 (4th Cir. 2018).  Vallia Friend was convicted for participating in the crimes against Samuel Lam and John Cummings, and the jury returned guilty verdicts on all three counts charged against her—conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); aiding and abetting carjacking, in violation of 18 U.S.C. § 2119(1) and 18 U.S.C. § 2; and aiding and abetting carjacking resulting in death, in violation of 18 U.S.C. § 2119(3) and 18 U.S.C. § 2.  The Friends never made more than a few hundred dollars from these crimes, treating their victims' lives as essentially worthless, and following their final crime, the murder of Samuel Lam, the Friends used the truck that they stole from Lam to travel to Texas in a failed attempt to make money by transporting a truckload of marijuana.

1

The Friends specifically targeted independent truckers who were traveling alone, reasoning that they were more vulnerable to attack and less likely to be the subject of an organized search-and-rescue effort. John Cummings, who was in his 60s at the time of the attack on him, illustrated the vulnerabilities that the Friends sought to exploit. He was left permanently injured and unable to continue with his livelihood as a trucker.

Two weeks after the beating and carjacking of Cummings, members of the Friend family pulled Samuel Lam into a van, jerked a pillowcase over Lam's head, taped it tightly with duct tape, bound his arms and feet, and beat and kicked Lam during a 50-minute drive to Lake Anna on April 25, 1999.

Samuel Lam, born in Hong Kong in 1951, came to the United States in the late 1960s, and, as his son described at a sentencing for Philip Friend, "was a free spirit, creative and articulate with a love for music and all things American." No. 3:99-cr-201, Doc. 795 at 145. He had not planned on being a truck driver, but after meeting his wife in Brooklyn and starting a family, "he sacrificed his own dreams to make a life for us," enabling two sons to go to college. *Id*. at 146. Members of the Friend family dragged Lam into a swamp, while Lam was still alive and begging for his life. The pillowcase and truck cab were covered in blood from his beatings. And after the group reached the edge of the swampy area, Eugene Friend said that someone had to shoot Lam to death, and Travis Friend shot Lam seven times. When Lam tried to escape, Eugene grabbed him, choked him, and tried to drown him. Although Lam was able to break free, the Friends left him moaning and dying in the swamp.

More than three people were victimized by the Friends. Felix Lam, the son of Samuel Lam, explained at a resentencing for Philip Friend that "the impact of this crime was extremely

devastating to our family, and it is a nightmare that still affects us to this day."  No. 3:99-cr-201, Doc. 795 at 144.  "Can you put yourself in my father's shoes?" he asked.  *Id*. at 147.

Defendant Vallia Friend, who is the mother of Eugene, Travis, and Philip Friend, seeks compassionate release for her role in the maiming of John Cummings and murder of Samuel Lam.  Although she did not pull the trigger of a gun or herself beat Cummings or Lam, she was an active participant in the crimes and willingly let her own children kill other people.  As she seeks leniency now, her son Philip Friend, who was 15 years old at the time of the offenses, has sought sentence reductions because of his age at the time of the offense, while he argued that he "was following the commands of his mother and older brother" and that "it would have been extremely difficult for [him] to extricate himself from these circumstances."  *Friend*, 755 F. App'x at 237.  Defendant should not be permitted to deflect her culpability for aiding and abetting her own children's crimes.

As explained below, defendant Vallia Friend has sought compassionate release from her warden because, she contended, her age of 69, high blood pressure, and high cholesterol put her at risk of death or serious illness from contracting COVID-19.  The warden denied her request on June 26, 2020.  Her present motion in this Court adds that she is obese, has bipolar disorder, and contracted COVID-19 at FCI Waseca in late September.  Although she claims now that she may be a risk for more severe illness if she is reinfected, citing a Business Insider article on the internet, she offers no medical evidence that her illness with COVID-19 has left her with any permanent physical impairments.  Indeed, BOP's medical records show that she was diagnosed positive on September 22, 2020, experienced aches, cough, and shortness of breath for several days, and was then deemed asymptomatic by September 26, 2020.  Defendant offers no medical evidence of any lasting physical impairment, and the United States is aware of none.  Courts

have found in circumstances like these that a prior infection did not support granting compassionate release. *Cf. United States v. Jordan*, 2020 WL 6504958, at \*3 (S.D. Calif. Nov. 5, 2020) ("[T]he fact that Jordan has already contracted COVID-19 and apparently recovered, without arguing he suffered severe effects, weighs against finding the existence of extraordinary and compelling circumstances based on his age alone.").

Given the gravity of defendant's crimes, this Court should deny her request to reduce her life sentence under the factors in 18 U.S.C. § 3553(a), even if defendant can establish that her medical conditions and age could satisfy the standard for an extraordinary and compelling reason for compassionate release.

## I.     Background

Defendant was convicted for her role in the truck hijacking and permanent maiming of John Cummings on April 10, 1999, and the truck hijacking and murder of Samuel Lam on April 25, 1999. The scheme began when defendant's son, Eugene Friend, bought a red Cadillac Fleetwood for $10,000 in 1998 from Shade "Rob" McEachin, who was having an adulterous affair with defendant. (J.A. 398, Exhibit P-9).[1] Eugene loved the Cadillac (J.A. 398), and McEachin told Eugene that, if he missed any of the payments, McEachin would repossess the car. (J.A. 399). But by February 1999, Eugene was not making the payments and creditors were hounding McEachin for the payments, leading McEachin to repossess the car. (J.A. 400). McEachin told Eugene that he needed to get a job and pay him $10,000 if he wanted the car back. (J.A. 403-04).

---

[1] Citations are to the joint appendix from defendant's direct appeal and from the district court docket.

Eugene was obsessed with getting the money to recover the Cadillac.  (J.A. 762).  He could not legitimately work as a truck driver because his license had been suspended.  (J.A. 314 (Stipulation No. 6), 760).  Eugene had a conversation with some other truckers, who told him that he could make $20,000 by driving to a warehouse in Texas, picking up a load of marijuana, and driving it to another state.  Eugene repeatedly talked about this plan.  (J.A. 764).

### A.  *The Cummings Carjacking and Maiming*

On April 10, 1999, defendant went with Eugene, Philip, and Charlene Thomas, who was Eugene's girlfriend, to hijack a truck for Eugene.  (J.A. 765-66).  Defendant drove her van with Charlene Thomas in the front passenger seat, and Eugene and Philip sitting in the rear of the van. (J.A. 766).  Eugene targeted older truckers because it would be easier to take control of their trucks.  (J.A. 766).  They traveled to a truck stop known as the Simmons Truck Plaza at Exit 8 on Interstate 95 North in Virginia.  (J.A. 614, 767-72).  Initially, Eugene and Philip broke into an unattended truck and tried to steal it, but Eugene was unable to start the truck.  (J.A. 769).  Then they saw a trucker, John Cummings, pull into the truck plaza and have problems turning his truck.  (J.A. 769-70).

Travis Friend was not present during the Cummings hijacking on April 10, 1999, because he was in jail at the time.  (J.A. 741, 765).  John Cummings, who was 62 years old at the time of his hijacking, worked as an independent trucker from Georgia.  (J.A. 607-09).  Cummings was driving a 1994 Peterbilt truck and pulling a 1991 Great Dane trailer with a refrigerator unit that contained produce, which Cummings was hauling from Florida to grocery stores in New York. (J.A. 611-13).  Cummings, who was a diabetic, stopped at the Simmons Truck Plaza because he was tired and needed to rest.  (J.A. 614).  He pulled his truck into the truck stop, parked his vehicle, and went outside to check the tires on his truck when a van pulled up.  Cummings later

5

testified that the van looked like defendant's van. (J.A. 616-17). The driver, whom Cummings described as fitting defendant's description, asked him if he wanted a date. (J.A. 618-19). Cummings also observed a thin female, matching Thomas's description, sitting in the passenger seat. (J.A. 619). The driver offering a date to Cummings was defendant, and the passenger was Thomas. (J.A. 771). Defendant asked Cummings several questions, including where he was from and whether he was alone. (J.A. 772).

Cummings declined defendant's offer of a date and began walking back to his truck. (J.A. 620). Philip then leaped from the van and jumped Cummings. (J.A. 772). Eugene soon joined his brother in the attack and helped shove Cummings into his truck. (J.A. 772). Cummings felt as if a "wolf pack" came over him. (J.A. 620). He kicked his first attacker (Philip) but was then forced into his truck, where he was repeatedly beaten about his head and face. (J.A. 620-21).

Cummings realized that two men were inside his truck, one who was referred to during the trial as the "beater" (Philip) and the other as the "driver" (Eugene). (J.A. 622). The "beater" wrapped duct tape around Cummings's head, covering his eyes and mouth, and around his hands and legs. (J.A. 623). Even though Cummings was completely bound in duct tape, the "beater" continued to beat and kick Cummings throughout the night. (J.A. 623). The "beater" threatened to place Cummings in the freezer unit unless he cooperated, and demanded to know where Cummings kept his drugs because the "beater" stated that all truckers transported drugs. (J.A. 625). The "beater" also demanded his money and stole a total of six rings that Cummings had. (J.A. 625). As Eugene and Philip attacked Cummings, defendant re-positioned her van in front of the truck. (J.A. 773). Eugene then started Cummings's truck and pulled out of the truck stop with defendant and Thomas following in the van. (J.A. 774-75).

They drove to another truck stop, where Eugene unhitched the trailer from Cummings's truck, leaving it at the truck stop.  (J.A. 775-78).  The truck, driven by Eugene and containing Philip and Cummings, and the van, driven by defendant and also carrying Charlene Thomas, returned to the Simmons Truck Plaza, where they stole a trailer of logs.  (J.A. 779).

After Eugene hitched the trailer of logs to Cummings's truck, he drove to the Pierce-Johnson Lumber Company in Dillwyn, Virginia, followed by the van driven by defendant.  (J.A. 781-83).  It was dark and the business was closed when they arrived at Pierce-Johnson.  (J.A. 784).  Eugene unhitched the trailer of logs and left them at the lumber company.  (J.A. 784).  Eugene began taking various items from inside Cummings's truck including: a small TV (Exhibit JC-18), a Makita drill (Exhibit SP-1), a baseball bat (JC-24), a flashlight (JC-17), a CB radio, and Cummings's wallet (Exhibit JC-10). (J.A. 628-36, 784-88).  Eugene and Philip also took cash from Cummings's wallet, which they divided among Eugene, Philip, defendant and Charlene Thomas.  (J.A. 788-89).

After leaving the trailer of logs at the lumber company and stealing the items from Cummings's truck, Eugene drove the truck (still containing Philip and Cummings), with the van (driven by defendant with Thomas as a passenger) following, to another truck stop at Zions Crossroads off Exit 136 on Interstate 64 in Virginia. (J.A. 649-50, 790).  When the truck stopped, the "beater" (Philip) told Cummings that he had come to the "end of his journey," which Cummings thought meant he was going to be killed.  (J.A. 638).  Eugene got out of the truck and went to the van where he retrieved a pen and piece of paper to write a note for Cummings as to where his trailer had been left.  (J.A. 790).  When he got back in the truck, Eugene loosened the tape on Cummings wrist while the "beater" told Cummings not to look out of his truck for 15 minutes or he would shoot up the truck.  (J.A. 638, 791).  Eugene and Philip, who had scratches

on his face and a broken lip from the attack on Cummings, then returned to the van.  (J.A. 791).
The quartet (defendant, Thomas, Eugene and Philip) drove back to the Friend residence, arriving
at approximately 6:00 a.m. the next day (Sunday, April 11, 1999).  (J.A. 792).

Cummings waited the 15 minutes and then cut the rest of the duct tape off his body with a
razor blade he had in the truck.  (J.A. 139).  He found a note on the steering wheel of his truck
that read "95 S, exit 33 truck stop."  (J.A. 639, 652).  Cummings then went into the convenience
store at the truck stop and asked the clerk to call the police.  (J.A. 640).  Eventually, Cummings
was hospitalized and treated for his injuries.  As a result of the attack, Cummings could no
longer see out of his left eye, could not hear out of his right ear, and could no longer perform his
life's work as a truck driver.  (J.A. 640-41).

Virginia State Police Special Agent Harold Adams arrived at the truck plaza to process
Cummings's truck at approximately 6:30 a.m. on April 11, 1999.  (J.A. 649).  He seized the note
that read "95 S, exit 33 truck stop" from Cummings's truck, and ultimately submitted it to the
FBI laboratory for analysis.  (J.A. 652).  An FBI handwriting expert later concluded that the
writing on the note bore similarities to the handwriting of Eugene Friend.  (J.A. 664-66).  Two
telephone numbers were written on the back of the note.  One was to Union Camp Containers,
where Shade McEachin worked.  (J.A. 653-54).

Special Agent Adams also lifted a latent fingerprint from a Hardee's cup found in
Cummings's truck, which matched that of Philip Friend.  (J.A. 657, 677-78).  After processing
Cummings's truck, Special Agent Adams followed the instructions on the note and traveled to
the Davis Truck Plaza at Exit 33 on Interstate 95, where he found the trailer that Cummings was
pulling.  (J.A. 658-60).

The next morning (Monday, April 12, 1999) defendant, Charlene Thomas and Eugene Friend returned in defendant's van to the Pierce-Johnson Lumber Company to sell the trailer of logs they had stolen. (J.A. 793). Eugene paid another truck driver to pull the trailer of logs into the lumber company, where he was given a check made payable to Friend Logging for $1455.17 for the logs. (J.A. 693, 696-99,705-07, 793-94). Pierce-Johnson banked at the Farmer's Bank National Bank, about 4-5 miles away in Dillwyn, Virginia. (J.A. 709). Defendant, Eugene and Charlene Thomas drove to the bank, where defendant and Eugene went inside to cash the check. (J.A. 794-95). Defendant Vallia Friend endorsed the check and provided her driver's license and social security number for identification. (J.A. 712). The bank's surveillance cameras captured defendant and Eugene on videotape cashing the check. (J.A. 712-14, Exhibit FB-1). Eugene spent most of the money from the sale of the logs on marijuana. (J.A. 795).

On approximately Wednesday, April 14, 1999, Eugene and Charlene Thomas met with James Edwards, another trucker, at Jean's Supermarket in the Bellemeade Section of Richmond. (J.A. 718-21, 796). Eugene told Edwards that his truck had broken down and that he needed someone to move a trailer for him. (J.A. 721, 796). Edwards drove his truck with Eugene and Thomas inside from Richmond to the Pierce-Johnson Lumber Company in Dillwyn, where they hitched the now-empty "4 Ranson" trailer to Edwards's truck. (J.A. 721-23, 797-98). They took the trailer to the Southside Shopping Center in Richmond, where they left it. (J.A. 723, 798). Eugene paid Edwards $100 for moving the trailer. (J.A. 724).

### C.    The Lam Hijacking

Travis Friend was released from the Richmond City Jail on April 20, 1999. (J.A. 741). On Friday, April 23, 1999, the Friend family set out to hijack another truck because Eugene wanted to use the truck to get marijuana. (J.A. 801). This time, Eugene wanted to attack a white

trucker (Cummings was black).  (J.A. 801).  Eugene wanted the trucker to be alone and older,

because it would be easier to subdue him.  (J.A. 801).  Eugene also wanted to attack an

independent trucker (an "owner-operator") because he believed that a trucking company would

search for a missing trucker.  (J.A. 447, 802).  On Friday, April 23, 1999, the group (consisting

of defendant, Eugene, Travis, Philip and Charlene Thomas) drove in defendant's van

unsuccessfully looking for a truck to hijack.  (J.A. 802).  At that time, the only weapon that the

group had was a BB gun.  (J.A. 803).

   On Saturday, April 24, 1999, Eugene said that they should get a firearm from one of his

friends, Stanley Kirkwood.  (J.A. 805).  Kirkwood owned a 10 mm Smith & Wesson firearm that

held up to 10 bullets in its clip.  (J.A. 428-29).  Defendant, Philip and Thomas went to

Kirkwood's apartment, where Philip asked Kirkwood to join the four in defendant's van.  (J.A.

435-36).

   In the presence of defendant and Thomas, Philip asked Kirkwood if they could use his

gun.  (J.A. 436).  Philip said that, if they could use his gun, they would be able to steal a truck,

which they could use to deliver a load and make $20,000.  (J.A. 437-38).  Kirkwood said that

they could use his gun only if he could go with them because he wanted a larger share of the

profits.  (J.A. 437).  The four then drove in the van to an abandoned house where Kirkwood hid

his gun.  (J.A. 438-39).

   After returning Kirkwood to his apartment, they agreed to pick him up the next day to go

on the hijacking mission.  (J.A. 439).  Eugene Friend later told Kirkwood that the "load"

consisted of marijuana.  (J.A. 439).

   On Sunday, April 25, 1999, defendant, Philip and Charlene Thomas picked up Kirkwood

at his apartment and drove in defendant's van to the Friend residence, where Eugene, Travis and

Philip were preparing for the hijacking by donning gloves, skull caps and masks. (J.A. 442, 806). Kirkwood had his gun and Philip had his BB gun. (J.A. 445). The group (consisting of defendant, Eugene, Travis, Philip, Thomas and Kirkwood) piled in defendant's van and drove north of Richmond on Interstate 95 past Kings Dominion amusement park. (J.A. 446, 807). Defendant drove with Charlene Thomas in the front passenger seat, Eugene and Philip in the rear seat, and Travis and Kirkwood in the back of the van. (J.A. 445). Eugene said that the plan was to take a truck from an older trucker who was an "owner-operator," because he would not turn up missing as soon as a driver from a company. (J.A. 447). Charlene Thomas was to pose as a prostitute and flash her breasts to passing truckers to lure them into pulling over. (J.A. 448, 808).

Samuel Lam was an independent trucker from Maine, born in Hong Kong and of Chinese descent. (J.A. 144). Lam lived with his wife, Matty, in Scarborough, Maine. (J.A. 145). No one else worked for him. (J.A. 145). The parties stipulated that, on April 20, 1999, Samuel Lam had picked up a shipment of perfume in Maine, which he then transported to Miami, Florida for Sargent Trucking. After delivering the perfume, Lam was contracted by Sargent Trucking to transport a shipment of plants to different K-Marts in Connecticut and Massachusetts, ending in Great Barrington, Massachusetts. Samuel Lam picked up the shipment of plants from the Costa Nurseries in Gould, Florida on April 23, 1999. All of the plants were labeled "K-Grow." Lam was to deliver the first shipment of plants to a K-Mart store in Darby, Connecticut, on April 26, 1999.

But Lam never delivered any of the plants to any of the K-Marts. On April 25, 1999, at 5:27 p.m., he stopped at the Flying J Travel Plaza at exit 104 on Interstate 95 in Carmel Church (Caroline County), Virginia, to refuel his tractor trailer. (J.A. 149-51, Stipulations 1 and 2).

Mrs. Lam last spoke to her husband by calling his cellular telephone on April 24, 1999.  The next time she called, someone else answered and said she had the wrong number.  (J.A. 148).

When Charlene Thomas flashed her breasts at Mr. Lam, he agreed to pull over at a rest area at Exit 107.  (J.A. 449-50, 558, 809; Exhibit P-17(b)).  Defendant and Thomas exited the van and went over to Lam's truck to talk to him.  (J.A. 452-53, 810-11).  Lam was interested in defendant, and she asked him if he was alone and where he was from.  (J.A. 810-11).  Lam indicated that he wanted to party with the women in a hotel room.  (J.A. 812).  The women agreed to follow him to a hotel.  (J.A. 812).

The records from the Days Inn, located at 5316 Jefferson Davis Highway (Route 1), Fredericksburg, Virginia, showed that, on April 25, 1999, at 8:10 p.m., Lam rented room 225 and never returned the key.  Additionally, the records from the housekeeping department indicated that room 225 had not been used.  (J.A. 151, Stipulation No. 3).

Defendant drove her van into the parking lot of the Days Inn and dropped off the four men before speaking to Lam, so he would not see them.  (J.A.459, 816).  Lam parked by the motel office and Lam told defendant and Thomas that he had a key to a room.  (J.A. 815-17).  Defendant then returned and picked up her sons and Kirkwood and drove to an area where Lam had parked his truck, near a restaurant adjacent to the motel.  (J.A. 459, 818).  Lam came over to the van and spoke to Thomas.  He wanted to get in the van, but Thomas said they needed condoms and wine, so Lam gave defendant $20.  (J.A. 462, 818).  Defendant drove her van across the street to a Shell Convenience Store, where she went in and bought two bottles of wine and a box of condoms.  (J.A. 463, 818-19).  The clerk at the convenience store remembered the transaction due to a rude comment made by another customer in the store and identified the purchaser as a heavy-set, black female of medium complexion, driving a white Chevy van with

either blue or brown stripes.  (J.A. 591).  This description fit defendant and her van.  (J.A. 999, Exhibits P-1,VN-9).

After buying the condoms and the wine, defendant drove her van back to the Days Inn parking lot where Lam's truck was parked.  (J.A, 463, 819).  Eugene told Philip to be prepared to grab Lam when he approached the van.  (J.A. 463).  When Lam went to open the van door to get inside, Philip tried to grab him but Lam broke away and ran.  (J.A. 464).  Defendant pulled her van out of the parking lot onto the highway but Eugene told her that she had to go back because Lam saw her, Thomas, and their license plate.  (J.A. 465, 821).  Defendant turned the van around and went back to "get" Lam.  (J.A. 466, 821).  Lam was near his truck when the four men jumped out of the van and attacked him.  (J.A. 466, 822).  Meanwhile, defendant repositioned her van between the restaurant and the men so as to prevent anyone from seeing the attack.  (J.A. 467, 823).  Eugene knocked Lam unconscious and then the group of men pushed Lam into his truck.  (J.A. 467).  Philip put a pillowcase over Lam's head and wrapped his head, hands and ankles with duct tape.  (J.A. 470).  As he had done to Cummings, Philip beat and kicked the bound Lam to the point where the pillowcase was soaked in blood, (J.A. 471-72).  Lam regained consciousness and asked why they were doing this to him.  (J.A. 472).  Travis told him to shut up or he would die.  (J.A. 472).  Eugene demanded his money.  (J.A. 472).

After Lam was subdued in the back of his truck, Eugene started the truck and began driving, followed by the van driven by defendant.  (J.A. 474, 824-25).  They drove for a substantial period of time until they came upon a causeway over Lake Anna.  (J.A. 475, 567, 825).  They stopped on the bridge and were going to dump Lam's body into the water but Travis said it was too shallow.  (J.A. 477).  Eugene had gotten out of the truck and spoken to defendant (his mother) on the bridge before deciding not to drop Lam's body at that spot.  (J.A. 477).  They

then drove to a remote location with a white building, where Eugene unhitched the trailer from Lam's truck.  (J.A. 479, 826).

The men then drove off in Lam's truck (with Lam inside) without the trailer, leaving defendant and Thomas in the van with the trailer.  (J.A. 480, 827).  Eugene drove the truck to a dirt road about 20 minutes away, off Route 522 south of Lake Anna in Louisa County, Virginia, and 43 miles from the Days Inn.  (J.A. 288, 297, 481).  Eugene parked the truck at the end of the dirt road and the men (Eugene, Travis, Philip and Kirkwood) pulled Lam out of the truck and dragged him down a path to a swampy area.  (J.A. 483-85).  Kirkwood was carrying his firearm.  (J.A. 485).  At this point, it was completely dark at the swamp.  (J.A. 485).  Eugene told the others that someone had to "off him" (kill Lam).  (J.A. 486).  Kirkwood refused to kill Lam and set the firearm on the ground.  Travis picked up the gun and fired six shots into Lam.  (J.A. 488).  Kirkwood and Philip walked back to the truck, where Philip began ransacking it to see what he could steal before his older brothers got there.  (J.A. 489).  When Kirkwood and Philip returned to the swampy area, they found Eugene yelling at Travis, saying that Travis missed Lam.  (J.A. 490-91).  They could hear Lam moaning but couldn't find his body in the darkness despite the search efforts of Eugene, Travis and Philip.  (J.A. 492).  Finally, they agreed to stop searching and left Lam to die in the swamp.  (J.A. 492).  The remains of Lam's body would not be found until nearly a year later, when FBI agents found parts of his body, pieces of duct tape, and six 10 mm cartridge casings (fired from the same gun) in the swamp.  (J.A. 295-314, Stipulation No. 31).

The four men drove back in Lam's truck to where they had left the trailer, defendant and Thomas.  (J.A. 493-94, 828).  They opened up the trailer and found that it was full of plants.  (J.A. 495, 830).  Eugene wanted an empty trailer so he could transport marijuana inside.  (J.A.

498, 831).  Eugene hitched the trailer to Lam's truck and the group drove to Richmond,
ultimately arriving at the residence of one of their relatives in Chesterfield County.  (J.A. 497,
568, 832).  The group, including defendant and Thomas, began unloading the plants into a
carport next to the residence until defendant told them to stop because she could not explain to
the relatives the source of so many plants.  (J.A. 833).  They filled defendant's van with plants
for her to sell and then reloaded the rest into the trailer.  (J.A. 499, 833).

After reloading the plants, the Friend brothers (Eugene, Travis and Philip) left for Texas
in Lam's truck while defendant drove her van with Thomas and Kirkwood and full of plants back
to her residence.  (J.A. 501, 834).  Defendant, Thomas and Kirkwood unloaded the plants into
the laundry room in defendant's house.  (J.A. 502, 834).  Kirkwood took three plants with him.
(J.A. 502, 834).  Defendant drove Kirkwood to his apartment, where he hid the murder weapon
in a box on a shelf.  (J.A. 504).

Kirkwood was later picked up by his girlfriend.  (J.A. 504).  Kirkwood's roommate later
unknowingly threw away the gun when they were moving.  (J.A. 504-05).  Thomas stayed at
defendant's residence for about a week after the Lam hijacking.  (J.A. 835).  The following
weekend (the weekend of May 1, 1999, which was the weekend before Mother's Day) defendant
and Thomas drove around Richmond in defendant's van selling plants to various persons.  (J.A.
320-22, 329-33, 341-42, 353-56, 364-67, 372-74, 378-80, 384-86, 725-26, 837).  The purchasers
turned the plants over to the FBI, and all the plants were stipulated to have come from the
shipment that Lam was hauling.  (J.A. 586, Stipulation No, 14).  All of the plants had "K-Grow"
stickers on the bottom.  (J.A. 579).

On the road to Texas, the Friend brothers dropped Lam's trailer with the rest of the plants
at the Davy Crockett Travel Plaza at Exit 36 on Interstate 81 in Baileyton, Tennessee,

15

approximately 360 miles from Richmond, where the trailer was ultimately recovered by the FBI. (J.A. 157-171).  The Friend brothers then stole an empty trailer belonging to trucker Aldon Ray, which he had left unattended at the Sunshine Travel Center, off Exit 412 on Interstate 40 in Jefferson County, Tennessee. (J.A. 152, Stipulation No. 4).  The Sunshine Travel Center is approximately 44 miles from the Davy Crockett Travel Plaza. (J.A. 157).

On April 27, 1999, Texas State Trooper Jeff Burgess stopped Eugene driving Lam's truck for driving infractions at a weigh station near San Marcus, Texas.  (J.A. 174-80).  Eugene told him that the truck belonged to Sam Lam, who he had met at a truck stop in Arkansas.  (J.A. 180).  Both of Eugene's brothers were in the cab of the truck. (J.A. 178).  The trailer with Tennessee license plates was empty at that point.  (J.A. 181).  The Friend brothers then drove to San Antonio, where they met up with their cousin, Leonard Stinnett, on April 28, 1999.  (J.A. 185).  They asked Stinnett to find them a hotel room and some marijuana for their use.  (J.A. 189-90).  They stayed at Red Roof Inn in San Antonio during the night of April 29, 1999.  (J.A. 191, Stipulation No. 7).  On April 30, 1999, defendant wire-transferred $75 to Eugene Friend. (J.A. 192, Stipulation No. 8).

Apparently unsuccessful in their quest to pick up a load of marijuana in Texas, Eugene Friend contacted truck broker Robert "Dewey" Capps and agreed to transport a load of carrots from the McMannus-Wyatt Produce Company in Weslaco, Texas, to the J.S.G. Trading Corporation in Tinton Falls, New Jersey.  (J.A. 193, Stipulation No. 10).  Eugene Friend picked up the produce on May 1, 1999, and hauled it in Ray's stolen trailer.  (J.A. 193, Stipulation No. 10).

D.      *The Arrest of the Friend Brothers in Georgia*

On May 2, 1999 at 5:47 p.m., in Dade County, Georgia, Deputy Stan Hartine stopped

Eugene Friend, driving Lam's truck, and pulling Ray's trailer, for driving infractions.  (J.A. 111-

15, 134).  Deputy Hartine determined that the trailer was stolen and that Eugene's driver's

license was suspended, so he arrested him.  (J.A. 126-27).  Both Travis and Philip were in the

cab and taken into custody.  (J.A. 132-33).  Travis had Lam's cellular telephone (GA-29) in his

possession, (J.A. 130).  The next day (May 3, 1999), Dade County Deputies began a search of

the truck but stopped when they found the bloody pillow case (Exhibit GA-11), that had been

over Lam's head while he was being beaten.  (J.A. 138-41).  Deputy Jim White was holding the

cellular telephone taken from Travis when it rang and a member of the Scarborough, Maine

Police Department indicated that Samuel Lam was missing.  (J.A. 210).  Dade County Captain

Don Hicks recovered a piece of paper from Philip's shoe that read: "[street address deleted]

Scarborough, Maine 04072."  (J.A. 230).  Searches of Lam's truck by agents of the Georgia

Bureau of Criminal Investigation and the FBI revealed blood stains containing Lam's DNA

throughout the truck.  (J.A. 256-71, 278-83, 948-51; Exhibit DC-1).  A pair of sweatpants taken

from Philip contained his DNA as well as a blood stain with Lam's DNA. (J.A. 956; Exhibit DC-

5).  A sweatshirt that Eugene was wearing at the time of his arrest (Exhibit GA-20) contained a

blood stain with Lam's DNA and another blood stain with both Lam's and Cummings's DNA

mixed together.  (J.A. 959; Exhibit DC-7).

Late on Sunday, May 2, 1999, Philip called defendant (his mother) and told her that he

and his brothers had been arrested in Georgia.  (J.A. 838).  On Monday, May 3, 1999, defendant

and Charlene Thomas drove in defendant's van to the bank and then left for Georgia.  (J.A. 837).

On May 4, 1999, Captain Hicks interviewed defendant in Dade County, Georgia.  (J.A. 227;

Exhibits GA-52A & GA-52B).  During the tape-recorded interview, defendant repeatedly lied to Captain Hicks, telling him that, on Saturday, April 24, 1999, she had driven Eugene to various truck stops looking for a job and that he had stayed at her house that night but did not see him after that.  (S.A. 47, 53-54).  She also stated that she left for work on Monday, April 26, 1999, at approximately 9:00 a.m. and that Travis and Philip were still at her house at that time.  (S.A. 48, 51 -52).  This was easily proven false, as telephone records revealed that the Friend brothers had telephoned their mother's house on April 26, 1999, at 9:07 a.m. from Baileyton, Tennessee, where they left Lam's trailer.  (J.A. 573, Exhibit TP-2).  Defendant also denied knowledge of any violent acts committed by her sons.  (S.A. 55-56).  After the interview, Philip was released into his mother's custody and the three (defendant, Philip and Charlene Thomas) drove back to Richmond.  (S.A. 229, 840).

       **E.**    *Defendant's Efforts to Cover-up the Hijackings*

      On May 5, 1999, Virginia State Police Special Agent Craig Martin interviewed defendant at her residence.  She told him that she had driven Eugene to various truck stops on Saturday, April 24, 1999, looking for work, but he was unsuccessful.  (J.A. 241).  Defendant restated that she had not seen Eugene since the evening of April 24, 1999, and that Travis and Philip were at her residence when she left for work before 9:00 a.m. on Monday, April 26, 1999.  (J.A. 240-43).  On May 10, 1999, defendant pawned three of the rings stolen from John Cummings for $100.  (J.A. 842, 884-88).  On May 12, 1999, defendant rented storage unit 531 at the Spacemakers Mini-Storage in Richmond, where she hid the Makita drill taken from Cummings.  (J.A. 728-29, 843).  On May 14, 1999, FBI agents executed search warrants at her residence and her van.  (J.A. 889).  Defendant had just moved from one apartment to another in Richmond.  (J.A. 889, 896).  Blood stains with Philip's DNA were found in defendant's van behind the front passenger seat.

(J.A. 957-58).  On May 18, 1999, defendant, Philip, Shade McEachin, James Scruggs, aka

"Pretty," (a cousin of the Friend brothers), and Charlene Thomas appeared before the grand jury.

(J.A. 844-45, 891).  Charlene Thomas was separated from the others and began cooperating with

the Government.  (J.A. 893).  Based upon her information, a search warrant was executed at unit

531 at the Spacemakers Mini-Storage, and Cummings's Makita drill was recovered.  (J.A. 738).

Immediately before the search warrant was executed, defendant arrived at the storage facility

and, after being denied entry to the unit, provided the agents with the keys to it.  (J.A. 737, 895).

The execution of another search warrant that same night at defendant's new residence in

Richmond, resulted in the recovery of two plants stolen from Lam's trailer (Exhibits SH-1 and

SH-2), which were on the window sill in defendant's apartment, as well as a roll of duct tape,

and documents from Fierce-Johnson Lumber Company.  (J.A. 586, 896-900).  FBI agents

arrested defendant on July 21, 1999, inside her apartment and seized Cummings's flashlight

(Exhibit JC-17) from the apartment.  (J.A. 905).  The baseball bat (Exhibit JC-24) and CB radio

(Exhibit JC-25) stolen from Cummings's truck were recovered from one of defendant's friends

who was holding the personal effects of the Friend family after defendant's arrest.  (J.A. 902-03).

II.     **Analysis**

*A.      This Court should reach the merits of defendant's request for compassionate release and should not treat the exhaustion requirement as barring a review of the merits.*

Under 18 U.S.C. § 3582(c)(1)(A), a "court … may reduce the term of imprisonment" for

compassionate release upon request by an inmate.  Courts may hear such requests

> upon motion of the defendant after the defendant has fully exhausted all
> administrative rights to appeal a failure of the Bureau of Prisons to bring a motion
> on the defendant's behalf or the lapse of 30 days from the receipt of such a
> request by the warden of the defendant's facility, whichever is earlier....

*Id*.  The statute "therefore outlines two routes a defendant's motion can follow to be properly before the court.  Both routes begin with the defendant requesting that 'the Bureau of Prisons' 'bring a motion on the defendant's behalf.'"  *United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) (quoting § 3582(c)(1)(A)).  The statutory language of § 3582(c)(1)(A) "makes clear, defendants now may bring reduction-of-sentence motions on their own once they exhaust any administrative remedies or wait 30 days from the date they request relief from the Bureau of Prisons."  *United States v. Ruffin*, 978 F.3d 1000, __, 2020 WL 6268582 at *3 (6th Cir. Oct. 26, 2020).  The requirements outlined in § 3582(c)(1)(A) are mandatory, non-jurisdictional claim-processing rules that must be followed.  *See id*. at *2; *United States v. Alam*, 960 F.3d 831, 832-33 (6th Cir. 2020); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *United States v. Springer*, 820 F. App'x 788 (10th Cir. 2020).  The exhaustion requirement serves a valuable function by permitting BOP to consider claims for compassionate release first and providing at least a 30-day window for BOP to make an assessment.  As courts have recognized, this process aids courts and helps introduce some additional consistency in adjudicating claims of compassionate release.

Notably, the first avenue that § 3582(c)(1)(A) provides for exhaustion requires not only submitting a request to the warden, but also completing "all administrative right to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf."  In other words, under this provision, it is not enough for a defendant simply to receive a denial from the warden of his or her request.  Rather, the defendant must complete "all" administrative rights to appeal. *See* 28 C.F.R. § 571.63 (specifying when a decision by BOP on compassionate release constitutes a final administrative decision).  Here, defendant failed to comply with this avenue for relief.  She did request that the warden file a motion for compassionate release, citing her age,

and was denied on April 7, 2020, by the Office of General Counsel.  She then followed that up by requesting on June 22, 2020, compassionate release, citing the dangers of COVID-19 and her age, high cholesterol, and high blood pressure.  The warden denied that request on June 26, 2020, but there is no record of her exhausting administrative appeals from that decision.

The second way that a defendant may satisfy the exhaustion requirement is that he or she may file a motion in district court after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility."  Because the exhaustion requirement in § 3582(c)(1)(A) is satisfied by two alternative means, and an inmate may file "whichever" of these two means is completed first, a defendant may rely on the 30-day period even if the administrative appeals process is not complete.  *See United States v. Harris*, 973 F.3d 170 (3d Cir. 2020) (government concedes and Court agrees that an inmate may file in court 30 days after presenting the request to the warden, whether the administrative process is complete or not).  It can readily happen, therefore, that a defendant will not have completed the administrative appeals process by the time the 30-day period elapses.  In that situation, the statutory exhaustion requirement will be complete upon the completion of the 30 days.

One other consideration is that courts have properly found that exhaustion was not satisfied when a defendant presents different claims to the warden and a district court.  *See, e.g., United States v. Douglas*, 2020 WL 5816244, at *2 (D.D.C. Sept. 30, 2020); *United States v. McNair*, – F. Supp. 3d –, 2020 WL 5036201, at *3–4 (D.N.J. Aug. 26, 2020).  As cases like these note, the regulations implementing § 3582(c)(1)(A) require that an inmate's request "shall at a minimum contain," among other things, "[t]he extraordinary or compelling circumstances that the inmate believes warrant consideration."  28 C.F.R. § 571.61(a).  Here, defendant's motion with this Court adds her obesity, bipolar disorder, and recent COVID-19 infection as additional

grounds for relief.  But the circumstances here do not involve a defendant who seeks compassionate release on materially different grounds in the request to the warden and the motion in the district court.  Although a court could wait until a defendant exhausted these additional health conditions, the United States believes that in the circumstances of this case, none of these additional factors will make any difference and add only marginally to defendant's original claim to the warden.  Rather than confront a close question on whether exhaustion has been satisfied in these circumstances, the United States notes that, as the authority cited above shows, the exhaustion requirement is not jurisdictional, and a third round of presenting a request for compassionate release to the warden, followed by resubmission of a motion with this Court for compassionate release, would add needless procedural steps here.  Hence, the United States believes that the Court should reach the merits of defendant's claim.

>  **B.     This Court should deny on the merits defendant's request for compassionate release.**

The defendant bears the burden to demonstrate that he is entitled to compassionate release under § 3582(c)(1)(A)(i).  *See White v. United States*, 378 F. Supp. 3d 784, 785 (W.D. Mo. 2019); *see also generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise … the burden of persuasion lies … upon the party seeking relief.").  Compassionate release requires that a defendant establish as a threshold matter "extraordinary and compelling reasons" for such relief under § 3582(C)(1)(A)(i).

Courts have generally agreed the existence of the pandemic, standing alone, is not a sufficient basis for granting compassionate release.  As the Third Circuit put it, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's

statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).  Instead, courts in this district have found "extraordinary and compelling reasons for compassionate release [on the basis of COVID-19] when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, — F. Supp. 3d —, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, — F. Supp. 3d —, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020)).[2]

Courts have found that the mere fact that a defendant has a medical condition and may contract COVID-19 does not necessarily justify compassionate release.

- Order at 5, *United States v. Bunch*, No. 4:15-cr-87 (RGD), (E.D. Va. May 1, 2020), ECF No. 151 (bronchitis and sleep apnea were not sufficiently compelling to justify compassionate release), *aff'd*, — F. App'x —, No. 20-6682, 2020 WL 3989463 (4th Cir. July 15, 2020) (per curiam).

- *Holt v. United States*, No. 4:18-CR-93 (RAJ), 2020 WL 3802718, at *3 (E.D. Va. July 7, 2020) ("[T]here is no indication that Petitioner's elevated cholesterol is not well managed or has worsened into a more serious cardiopulmonary issue.").

- *Zellner v. United States*, No. 2:99-CR-164 (RAJ), 2020 WL 3803031, at *3 (E.D. Va. July 7, 2020) ("The Court is unable to conclude that Petitioner is particularly vulnerable to COVID-19 based on his medical records, which do not provide enough information about his medical issues to show a heightened risk of severe illness or death.").

- *Wilson v. United States*, No. 2:11-CR-180-5 (RAJ), 2020 WL 3315995, at *3 (E.D. Va. June 18, 2020) ("There is also no evidence that Petitioner suffers from an unmanageable liver disease, or that his Hepatitis B is not well controlled. In fact, the record shows that medical personnel at FPC Montgomery are addressing Petitioner's medical condition.").

- *United States v. Shmuckler*, No. 1:11-CR-344 (LMB), 2019 WL 6257959,

---

[2] *See also United States v. Little*, No. 1:10-CR-135 (CMH), 2020 WL 3442173, at *2 (E.D. Va. June 23, 2020) (adopting the criteria from *Feiling*); *United States v. White*, No. 3:18-CR-61 (HEH), 2020 WL 3442171, at *5 (E.D. Va. June 23, 2020) ("Defendant's request for release on home confinement is based upon nothing more than 'the mere possibility that COVID-19 will spread to his facility'-a fear that is insufficient to justify release."(citing *Feiling*)).

at *3 (E.D. Va. Nov. 22, 2019) (denying compassionate release where defendant "was "able to manage most of his medical issues through medication and the use of assistive devices" while in prison).

Here, defendant fails to establish that her bipolar disorder creates a meaningful risk factor for severe illness if she contracts COVID-19 again.  *See, e.g., United States v. James*, 2020 WL 3567835 (D. Minn. July 1, 2020) (significant mental health disorder like bipolar disorder not a risk factor).  She also fails to show that her high blood pressure creates a sufficient risk factor. *United States v. Adams*, 2020 WL 3026458 (D. Conn. June 4, 2020) (59-year-old inmate with high blood pressure failed to establish sufficient risk).  The same is true of her cholesterol levels. *United States v. Ram*, 2020 WL 3100837 (W.D. Ark. June 11, 2020) (defendant's prediabetes, back pain, high blood pressure, high cholesterol, and glaucoma do not rise to the level of CDC risk factors).

Likewise, defendant fails to show that her prior infection with COVID-19 itself establishes an extraordinary and compelling reason for compassionate release.  Defendant was diagnosed positive on September 22, 2020, experienced aches, cough, and shortness of breath for several days, and was then deemed asymptomatic by September 26, 2020.  Defendant identifies no medical evidence of any lasting physical impairment, and courts have found in circumstances like these that a prior infection did not support granting compassionate release.  *Cf. United States v. Jordan*, 2020 WL 6504958, at *3 (S.D. Calif. Nov. 5, 2020) ("[T]he fact that Jordan has already contracted COVID-19 and apparently recovered, without arguing he suffered severe effects, weighs against finding the existence of extraordinary and compelling circumstances based on his age alone.").

As courts have explained, age alone is not an extraordinary reason for compassionate release in the context of the COVID-19 pandemic.  *See, e.g., United States v. Cooper*, 202 WL 4882535, at *3 (N.D. Ind. Aug. 20, 2020) ("[H]is age alone without any underlying medical

24

condition making him more likely to experience serious complications from the disease, does not support a finding that extraordinary and compelling reason require her sentence."). Although severe obesity creates a risk factor for COVID-19, courts are not obliged to grant compassionate relief when a defendant has a risk factor. *United States v. Oliver*, 2020 WL 2768852, at \*7 (E.D. Mich. May 28, 2020) (although defendant presents the risk factor of severe obesity, "[g]ranting Oliver compassionate release and reducing his sentence to time served when he has served only three months of a ten-year sentence would lead to unwarranted sentencing disparities and improperly minimize the seriousness of his drug-trafficking offense.").

Moreover, although defendant's prison, Waseca FCI, presently has four inmates and one staff member who are positive for COVID-19, the same facility has had 443 inmates and 15 staff members recover. BOP has taken significant steps to control the spread of the novel coronavirus. As in all parts of American society, COVID-19 remains difficult to contain, and BOP has not been able to prevent all infections. But BOP's efforts have been significant and yielded results in reducing significantly infections at defendant's prison.

In the end, this case can be analyzed most simply by taking into account the statutory sentencing factors. Even if a district court finds that a defendant has established an extraordinary compelling reason, a court must still assess the sentencing factors under 18 U.S.C. § 3553(a) before deciding to grant relief, as § 3582(c)(1)(A) expressly provides. Here, in applying the § 3553(a) factors, this Court should deny relief.

Defendant offers no valid basis for conclude that her sentence of life imprisonment was unjustified under § 3553(a) for her aiding and abetting two carjackings, one of which led to permanent injuries to John Cummings and the other which led to the death of Samuel Lam. Defendant willingly participated and assisted her own children in carrying out these crimes. The

25

harm to the victims has not changed at all.  Cummings, who suffered injuries severe enough to prevent him from working as a truck driver, has since passed away.  Samuel Lam's life was taken from him.  And his family grieves his loss to this day.  Defendant also participated in a scheme that has led to the imprisonment of her own family members.  She failed to protect her own children.  What she offers now is not remorse, but a request to be freed from the burdens of a justified, lawfully imposed life sentence, a sentence that was imposed because of defendant's role in some of the most grievous harm for which a person can be held responsible.  As the extensive review of the evidence above demonstrates, defendant was no mere bystander.  The jury properly held her liable for aiding and abetting two carjackings that led to serious injuries and a murder, at the hands of defendant's family.  She, like her children, sought to profit personally from these acts.  A sentence reduction is unjustified in this case.  Defendant's existing sentence appropriately reflects the seriousness of the offenses, the need to promote respect for the law, and the requirement that just punishment be imposed.  18 U.S.C. § 3553(a)(2)(A). Defendant's sentence must afford adequate deterrence, § 3553(a)(2)(B), protect the public from further crimes of the defendant, § 3553(a)(2)(C), and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment, § 3553(a)(2)(D). Defendant's guideline sentence appropriately serves those goals.  Although her record of prison infractions is minimal, and like most inmates, she has taken advantage of educational opportunities in BOP, these do not offset the gravity of her crimes.

Finally, if this Court were to disagree with the United States' position and grant a reduction that would result in defendant's immediate release, any release order should require defendant to undergo a 14-day quarantine controlled by BOP.

**Conclusion**

For the foregoing reasons, the Court should deny the defendant's motion for compassionate release.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

_____/s/_____
Richard D. Cooke
Brian R. Hood
Assistant United States Attorneys
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Office:   (804) 819-5471
Email:    richard.cooke@usdoj.gov

**Certificate of Service**

I certify that on November 19, 2020, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.

By:    _____/s/_____
        Richard D. Cooke
        Assistant United States Attorney
        United States Attorney's Office
        919 East Main Street, Suite 1900
        Richmond, Virginia 23219
        Office:   (804) 819-5471
        Email:   richard.cooke@usdoj.gov