## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:99-cr-00201-REP** |
| | ) | |
| **VALLIA CAROLYN FRIEND,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE PURSUANT TO SECTION 603(B) OF THE FIRST STEP ACT AND 18 U.S.C. § 3582(c)(1)(A)

The government opposes Ms. Friend's motion for compassionate release under Section 603(b) of the First Step Act and 18 U.S.C. § 3582(c)(1)(A). The government does not contest that Ms. Friend's facility has suffered an outbreak in which 75 percent of the inmates were infected with COVID-19, nor that she remains at risk of reinfection. The government's reason for its opposition are that (1) Ms. Friend's medical conditions and the presence of COVID-19 at FCI Waseca do not present a particularized susceptibility and a particularized risk of contracting COVID-19, and that (2) given the gravity of her crimes, the 18 U.S.C. § 3553(a) factors weigh against her release. The government is incorrect on both counts.

## LEGAL ARGUMENT

**A.    Ms. Friend's age, obesity, hyperlipidemia and hypertension make her particularly susceptible to severe illness or death from COVID-19.**

As the government notes, courts in this district have found that "extraordinary and compelling reasons for compassionate release [on the basis of COVID-19] when an inmate shows both a particularized susceptibility to the

1

disease and a particularized risk of contracting the disease at his prison facility."[1] The government misunderstood Ms. Friend's original motion as she does not assert that her bipolar disorder or her previous infection with COVID-19 are extraordinary and compelling circumstances warranting relief.[2]  Instead, it is her age, severe obesity, and comorbidities of hyperlipidemia (high cholesterol) and hypertension combined with the ongoing presence of COVID-19 in her facility, that constitute extraordinary and compelling circumstances for release.[3]

This Court only need find that her age and severe obesity make her uniquely susceptible to severe complications arising from COVID-19, which is still present at her facility, and Ms. Friend will have demonstrated extraordinary and compelling circumstances.  The CDC guidelines readily confirm that Ms. Friend remains at risk – listing older adults and people with certain medical conditions, including obesity, at increased risk for severe illness or death from COVID-19.[4] Although our understanding of COVID-19 continues to develop daily, the CDC periodically issues updates on the known risk of severe COVID-19 illness based on underlying medical conditions. Presently, research shows one's "risk for hospitalization if [they] have

---

[1] Dkt. 849 at 23 (quoting *United States v. White*, — F. Supp. 3d —, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020)).
[2] Dkt. 849 at 3, 21, 24. The impact that the COVID-19 lockdown in the carceral environment has on someone with bipolar disorder, like Ms. Friend, is instead something this Court should consider as a mitigating circumstance under the § 3553(a) factors.
[3] Dkt. 848 at 12.
[4] *See* CDC, *People at Increased Risk for Severe Illness*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html.

any of the following conditions and get COVID-19, compared to people without

the[se] condition(s):"[5]

| Asthma | Hyper-tension | Obesity (BMI>30) | Diabetes | Chronic Kidney Disease | Severe Obesity (BMI>40) | 2 Conditions* | 3 or more Conditions* |
|---|---|---|---|---|---|---|---|
| 1.5x | 3x | 3x | 3x | 4x | 4.5x | 4.5x | 5x |

*Conditions include asthma, obesity, diabetes, chronic kidney disease, severe obesity, coronary artery disease, history of stroke and COPD.

*Fig. 1: Hospitalization Rates Versus Control for COVID-19 Comorbidities*

In recognition of the seriousness of COVID-19 for people with certain underlying medical conditions, the Department of Justice has issued internal guidance directing the government to concede that defendants with CDC-identified risk factors can establish "extraordinary and compelling reasons" warranting compassionate release.[6] For this reason, the government has conceded in numerous cases that a defendant presents "extraordinary and compelling" reasons for release where he or she has at least one risk factor recognized by the CDC, even if that typically would not be enough during ordinary times.[7] Specifically, the government

---

[5] Centers for Disease Control, *COVID-19 Associated Hospitalization Related to Underlying Medical Conditions*, available at: https://www.cdc.gov/coronavirus/2019-ncov/downloads/covid-data/hospitalization-underlying-medical-conditions.pdf.

[6] *See, e.g., United States v. Steven Cole*, No. ELH-18-167, Dkt. No. 95 (D. Md. Jul. 30, 2020)).

[7] *See, e.g.,* Letter Amending Government's Response, *United States v. Wise*, 1:18-cr-00072-ELH, ECF 185 (D. Md. May 18, 2020) ("consistent with current DOJ policy, the Government does not contest the Defendant's eligibility for being considered for compassionate release in this case because he suffers from a condition identified by the CDC as putting him at higher risk for severe illness."); Supplemental Response, *United States v. Wright*, 8:17-cr-00388-TDC, ECF 50 (D. Md, May 19, 2020) ("the Government concedes that the defendant's Type I diabetes, and perhaps other of her medical conditions,

in this district, and other districts, has readily and repeatedly conceded that defendants with a BMI of 30 or more have demonstrated an extraordinary and compelling circumstance. In this case, the Government admits that "severe obesity creates a risk factor for COVID-19" but quickly follows that with the uncontroversial reminder that, of course, "courts are not obliged to granted compassionate release when a defendants has a risk factor."[8]

This Court should find that Ms. Friend has demonstrated extraordinary and compelling circumstances based on her age and obesity, at a minimum, and then consider whether release is appropriate under the § 3553(a) sentencing factors. There should be no question that extraordinary and compelling circumstances exist in this case. The CDC has said, in no uncertain terms, that individuals with both obesity (characterized by a BMI of 30 or higher) and severe obesity (characterized by a BMI of 40 or higher) are at increased risk of severe illness from COVID-19.[9] In this district, the government has conceded that obesity constitutes an "extraordinary and compelling reason" in and of itself in four recent cases. In *United States v. Edwards*, the government conceded that the defendant's obesity constituted an extraordinary and compelling reason because his "obesity places him at higher risk for complications from COVID-19" where the defendant had a BMI of

---

constitute 'extraordinary and compelling circumstances' during the pandemic, even if these conditions in ordinary times would not allow compassionate release.").

[8] Dkt. 849 at 25.

[9] CDC, Risk Factors for COVID-19, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

34.[10] In *United States v. Huey*, the government notes that "given CDC guidance,

Huey's obesity constitutes an 'extraordinary and compelling reason' for her relief."[11]

In *United States v. Reyes*, the government conceded that "Reyes's morbid obesity

and high blood pressure are 'extraordinary and compelling reasons'" for relief.[12] In

*United States v. Ferizi*, the government noted that:

> It is evident that Ferizi has shown a particularized risk of contracting, or
> experiencing adverse consequences from, COVID-19. Ferizi's BOP medical
> file shows his height and weight as consistent with a body mass index, or
> BMI, greater than 30, which the CDC lists as a condition that increases the
> risk of severe illness from COVID-19,

and thus that Ferizi had established extraordinary and compelling reasons for

release.[13]

And then less than 100 miles away in the Western District of Virginia, the

government has readily agreed to eligibility on these grounds, even if ultimately the

government has argued release is inappropriate due to the § 3553 factors:

> "Manning's obesity, however, does place her at high risk for serious
> illness from COVID-19, which the government acknowledges presents
> an exceptional and compelling reason for release." [14] (compassionate
> release granted)

> "Specifically, Smith's obesity – BMI over 30 – places her at great risk of
> infection and, if she contracts the virus, she has a lower probability of
> recovery."[15] (compassionate release granted)

---

[10] *United States v. Edwards*, Case No. 303-cr-316, Dkt. No. 103 at 8-9 (E.D. Va. Oct. 10,
2020).
[11] *United States v. Huey*, Case No. 4:02-cr-80, Dkt. No. 76 at 12 (E.D. Va. Oct. 29, 2020).
[12] *United States v. Reyes*, Case No. 3:03-cr-195, Dkt. No. 537 at 7 (E.D. Va. Nov. 11, 2020).
[13] *United States v. Ferizi*, Case No. 1:16-cr-42, Dkt. No. 95 at 13 (E.D. Va. Sept. 4, 2020).
[14] *United States v. Manning*, 7:12-cr-42, Dkt No. 564 at 1 (BMI of 31.7)
(compassionate release granted)
[15] *United States v. Smith*, 6:15-cr-6, Dkt No. 216 (BMI of 35.7)

"According to current guidance from the Centers for Disease Control (CDC), Rosenbaum's coronary artery disease and obesity place Rosenbaum at higher risk for severe illness if they contract COVID-19, and these chronic conditions are thus an exceptional and compelling reason for his release."[16] (compassionate release granted)

"Although during ordinary times Propst's obesity would not qualify as extraordinary and compelling under the FSA, given the ongoing COVID-19 pandemic, the government recognizes Propst's obesity presents an exceptional and compelling circumstance."[17] (compassionate release granted)

"Singleton's obesity is an extraordinary and compelling reason in light of the COVID-19 pandemic."[18] (compassionate release granted)

"The government recognizes Payne's Type 2 diabetes and obesity place her at higher risk for serious illness if she contracts COVID-19 pursuant to the Centers for Disease Control (CDC) guidance and thus presents an exceptional and compelling circumstance."[19] (compassionate release granted)

Numerous studies confirm that obesity significantly increases the risk of severe COVID-19 illness.[20]  An obesity specialist and clinical physician from the University of Virginia recently explained that:

In most recent news, the Centers for Disease Control and Prevention reports that 73% of nurses who have been hospitalized from COVID-19 had obesity.

---

[16] *United States v. Rosenbaum*, No. 1:06-cr-68, Dkt No. 140 (BMI of 35.9)

[17] *United States v. Propst*, No. 3:06-cr-17, Dkt No. 852 (BMI of 32.6)

[18] *United States v. Singleton*, No. 1:05-cr-30, Dkt No. 421 (BMI of 35.5)

[19] *United States v. Payne*, 1:18-cr-25, Dkt No. 1217 (BMI of 46.6)

[20] Lighter, J., et al., *Obesity in Patients Younger Than 60 Years Is a Risk Factor for COVID-19 Hospital Admission*. Clinical Infectious Diseases, 2020.; Hur, K., et al., *Factors Associated With Intubation and Prolonged Intubation in Hospitalized Patients With COVID-19*. Otolaryngology–Head and Neck Surgery. 2020; 163(1): p. 170-178; Simonnet, A., et al., *High Prevalence of Obesity in Severe Acute Respiratory Syndrome Coronavirus-2 (SARS-CoV-2) Requiring Invasive Mechanical Ventilation*. Obesity (Silver Spring), 2020; Kalligeros, M., et al., *Association of Obesity with Disease Severity Among Patients with Coronavirus Disease 2019*. Obesity (Silver Spring), 2020; 28(7): p. 1200-1204.

> In addition, a recent study found that obesity could interfere with the effectiveness of a COVID-19 vaccine.[21]

In addition, "newer analysis shows that not only does obesity increase your risk of being sicker and dying from COVID-19, it increases your risk of getting infected in the first place."[22] Unsurprisingly, numerous courts have granted compassionate release where obesity was the underlying medical condition, well beyond the decisions referenced above where counsel indicated compassionate release was granted.[23] Ms. Friend, who suffers from severe obesity, hyperlipidemia and hypertension, is clearly at a higher risk of severe illness from COVID-19. Her conditions and incarceration in a facility that has been shown to be incapable of

---

[21] Catherine Varney, *COVID-19 Reveals How Obesity Harms the Body in Real Time, Not Just Over a Lifetime*, https://news.virginia.edu/content/covid-19-reveals-how-obesity-harms-body-real-time-not-just-over-lifetime-0.

[22] *Id.*

[23] *See, e.g.*, *United States v. Robinson*, 18-03042-04-CR-S-SRB (WDMO), 2020 WL 5200929, at*1 (W.D. Mo., July 22, 2020) (obesity, hypertension, type 2 diabetes, anemia, sleep apnea, heart disease); *United States v. Rodriguez-Acedo*, Case No. 19-cr-3539, Dkt. No. 44 (S.D. Cal. July 21, 2020) (type 2 diabetes, obesity, high blood pressure); *United States v. Plank*, No. 17-20026-JWL, 2020 WL 3618858 (D. Kan. July 2, 2020) (age, severe obesity, multiple heart attacks, congestive heart failure, type 2 diabetes, sleep apnea, COPD); *United States v. Hood*, No. 18-cr-30016 (C.D. Ill. October 23, 2020)(chronic kidney disease, obesity, hypertension); *United States v. Nazario*, No. 3:16-CR-186 (VLB), ECF No. 510 (D. Conn. Oct. 21, 2020) (obesity, breathing difficulties); *United States v. Rotante*, No. 3:17-CR-269 (JCH), ECF No. 71 (D. Conn. Aug. 12, 2020)(obesity, asthma, heart disease, type 2 diabetes, diabetic neuropathy, hyperlipidemia, hypertension, anxiety); *United States v. Johnson*, No. 3:18-CR-162 (MPS), 2020 WL 4449797, at *1, *4 (D. Conn. Aug. 3, 2020)(obesity, hypertension, pre-diabetic, undiagnosed chest pains, neuropathies); *United States v. Bruno*, No. 3:18-CR-61-VAB, ECF No. 137 (D. Conn. Aug. 3, 2020) (severe obesity); *United States v. Reed*, No. 3:19-CR-74 (JCH), ECF No. 1586 (D. Conn. June 30,2020) (hypertension, obesity); *United States v. Brickhouse*, No. 3:16-CR-114-VAB, ECF No. 470 (D. Conn. May 13, 2020) (severe obesity, high blood pressure, pre-diabetic); *United States v. Shehee*, 2020 WL 5229030, at *3 (E.D. Wash. Sept. 1, 2020) (Paraplegic, obesity, restrictive lung disease, asthma); *United States v. Terraciano*, No. 2:17-cr-00187-KJM-2 (E.D. Cal., Oct. 2, 2020) (overweight/obesity, hepatitis C, hypertension, smoking); *United States v. Colin*, No. 3:17-CR-4128 (S.D. Cal. Sept. 28, 2020) (severe obesity, type 2 diabetes).

preventing the spread of the virus meet the extraordinary and compelling grounds for release as stated in *United States v. White*.[24]

**B.      Ms. Friend's risk has not diminished because she already contracted COVID-19 once and has seemingly recovered.**

As a number of courts have recognized, it is possible for people who had seemingly recovered from COVID-19 to become re-infected, and even die.[25] The BOP has shown itself to be incapable of preventing the spread of the disease in the facility in which Ms. Friend is being held. A full 75% of inmates were infected at FCI Waseca within a few weeks of the virus being introduced to the facility by a staff member, showing how little ability inmates at the facility have to protect themselves from contracting the disease.[26] The government's assertion that the BOP "has not been able to prevent all infections" grossly understates the BOP's record in dealing with the disease.[27] Courts in this district have noted the "legitimate concerns about BOP's present ability to protect inmates adequately,

---

[24] *United States v. White*, — F. Supp. 3d —, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020).

[25] *See, e.g.*, *United States v. Heyward*, 17-cr-00527-PWG, ECF 83, 84 (D. Md. June 30, 2020) (granting compassionate release to a defendant who has recovered from COVID-19, but is still in isolation and "the Government does not dispute, that a secondary contraction of COVID-19 is possible"); *United States v. Yellin*, No. 3:15-CR-3181-BTM-1, 2020 WL 3488738, at *3 (S.D. Cal. June 26, 2020) (granting compassionate release to a defendant who tested positive after several court hearings and did not develop severe symptoms because "the possibility of reinfection persists" and citing the death of Adrian Solarazano as "an example of at least one inmate dying from COVID-19 after Terminal Island deemed him recovered from the virus"). *See also* Dkt. 848 at 17-19.

[26] Department of Justice, Office of the Inspector General, "Facility-Level BOP COVID-19 Trends, FCI Waseca," as of 22 November 2020, available at: https://www.arcgis.com/apps/MapSeries/index.html?appid=a3e98be1aab94eadaaeaa96ed17 6f418 (last accessed November 26, 2020) (showing the first case by a staff member on July 23, 2020, 212 inmate cases by the end of September, and 451 inmate cases by the end of October).

[27] Dkt. 849 at 25.

particularly in facilities where the virus has already begun to spread,"[28] in light of the "growing evidence of the BOP's chronic mismanagement of its vulnerable population during the COVID-19 pandemic."[29]

Other courts across the country have found that prisoners are at grave risk. "Even in the best run prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others."[30] Contrary to the government's arguments opposing release, the BOP's efforts to minimize the spread of the virus have not protected inmates,[31] and any lower rate in the current number of COVID-19 cases at FCI Waseca likely only reflects the temporary immunity the vast majority of inmates have had from the virus over the 90 days since the outbreak's peak in September, and a lack of re-

---

[28] *United States v. Chatelain*, No. 1:19-cr-133 (LMB), Dkt. No. 70 at 3 (E.D. Va. Apr. 24, 2020).

[29] *See, e.g., Woodard v. United States*, No. 2:12-cr-00105-RAJ-DEM, Dkt. No. 898 at 6 (E.D. Va. June 26, 2020).

[30] *United States v. Esparza*, No. 1:07-cr-00294-BLW, 2020 WL 1696084 (D. Idaho. Apr. 7, 2020).

[31] *See, e.g.*, *United States v. Atwi*, No. 18-20607, 2020 WL 1910152, at *4 (E.D. Mich. Apr. 20, 2020) ("Positive cases among federal prisoners continue to rise, and it does not appear that preventative measures are sufficiently working yet to flatten the curve in BOP facilities."); *United States v. Razzouk*, No. 11-CR-430 (ARR), Dkt. No. 136 at 8 (E.D.N.Y. Apr. 19, 2020) (BOP's efforts at FCI Otisville "did not protect [defendant] from exposure to the disease in the first instance, despite his vulnerable status"). *United States v. Muniz*, Case No. 4:09-cr-199, 2020 WL 1540325, at *1 (S.D. Tex. Mar. 30, 2020) ("[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers . . . demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection.").

testing by the BOP.[32] In fact, the BOP has conducted 589 tests in the facility,[33] which as of November 22, 2020, had only 581 inmates.[34] Information provided by the Department of Justice, Office of the Inspector General shows that 581 inmates have had one or more completed COVID-19 tests.[35] These numbers indicate that the facility has not been conducting widespread COVID-19 tests since September, when it had tested 560 inmates.

The government does not actually contest the possibility that Ms. Friend could be re-infected with COVID-19. As of now, guidance from the CDC indicates that immunity from a prior infection from COVID-19 lasts approximately 90 days.[36] The guidance states that

> [t]he duration and robustness of immunity to SARS-CoV-2 remains under investigation. Based on what we know from other related human coronaviruses, people appear to become susceptible to reinfection around 90

---

[32] Department of Justice, Office of the Inspector General, "Facility-Level BOP COVID-19 Trends, FCI Waseca," as of 22 November 2020, available at:
https://www.arcgis.com/apps/MapSeries/index.html?appid=a3e98be1aab94eadaaeaa96ed17
6f418 (last accessed November 26, 2020); Department of Justice, Office of the Inspector General, "Facility-Level BOP COVID-19 Inmate Testing Trends, FCI Waseca," as of 22 November 2020, available at:
https://www.arcgis.com/apps/MapSeries/index.html?appid=a3e98be1aab94eadaaeaa96ed17
6f418 (last accessed November 26, 2020); Federal Bureau of Prisons, "COVID-19 Coronavirus" available at https://www.bop.gov/coronavirus/ (last accessed November 28, 2020).
[33] Federal Bureau of Prisons, "COVID-19 Coronavirus" available at https://www.bop.gov/coronavirus/ (last accessed November 28, 2020).
[34] Department of Justice, Office of the Inspector General, "Facility-Level BOP COVID-19 Inmate Testing Trends, FCI Waseca," as of 22 November 2020, available at:
https://www.arcgis.com/apps/MapSeries/index.html?appid=a3e98be1aab94eadaaeaa96ed17
6f418 (last accessed November 28, 2020).
[35] *Id.*
[36] Centers for Disease Control, "Duration of Isolation and Precautions for Adults with COVID-19," Updated 19 October 2020, available at: https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html (last accessed Nov. 27, 2020).

10

days after onset of infection. To date, reinfection appears to be uncommon during the initial 90 days after symptom onset of the preceding infection[.][37]

As Dr. Tara Vijayan stated in her declaration filed in another compassionate release case, re-infection with COVID-19 has been documented, with some individuals presenting with more severe disease than the first infection.[38] Some factors that have been proposed to contribute to reinfection include: the lower durability and robustness of immunity with mild infection, the amount of the virus present at the time of re-exposure ("viral inoculum"), and mutations in the virus after infection.[39] For instance, there is evidence that individuals who previously had severe cases have a stronger and longer-lasting immunity to COVID-19 infection than individuals who had a milder illness.[40] The amount of viral inoculum is likely to be higher in a prison setting than in the outside world, where inmates are housed together and, especially in the winter when there is less opportunity to spend time outside, are less able to protect themselves by self-isolating.[41]

Within the BOP, there have been instances of inmates becoming re-infected, with at least two people dying from COVID-19 after having supposedly recovered. In the first case, the inmate, Mr. Adrian Solarzano, had long-term, pre-existing medical conditions recognized by the CDC as putting him at risk of severe illness

---

[37] *Id.*

[38] *United States v. Richard Cordova*, Case No: 3:19-cr-02453-BAS, Dkt. 43, Declaration of Tara Vijayan, at 3 (S.D. Cal, Nov. 24, 2020), citing Kim AY, Gandhi RT, "Re-infection with SARS-CoV-2: What Goes Around May Come Back Around," *Clin Infect Dis.* 9 October 2020, doi: 10.1093/cid/ciaa1541.

[39] *United States v. Richard Cordova*, Case No: 3:19-cr-02453-BAS, Dkt. 43 at 4.

[40] *Id.*

[41] *Id.*

from COVID-19. He was considered recovered from the virus but within weeks fell

ill again and died a few days later.[42] In the second case, the inmate, Mr. Ricky Lynn

Miller, who also had long-term, pre-existing medical conditions recognized by the

CDC as putting him at risk of severe illness from COVID-19, first tested positive for

the virus on June 1, 2020.[43] On July 5, 2020, he tested negative. On September 9,

2020, he was treated by institutional medical staff at FCI Butner for shortness of

breath and leg edema. He was then transferred to an outside hospital. On

September 16, 2020, he tested positive for COVID-19. On September 17, 2020, he

died. Ms. Friend, who similarly has particularized susceptibility to COVID-19 from

her long-term medical conditions, specifically severe obesity, hyperlipidemia and

hypertension, also has a particularized risk of infection through her incarceration at

FCI Waseca. This particularized susceptibility and risk is not diminished because

she has already contracted and seemingly recovered from COVID-19.

**C.   Ms. Friend is not a danger to the community, and the 18 U.S.C.
      § 3553(a) factors weigh in favor of her release.**

The government advances the curious argument that "Defendant offers no

valid basis for [sic] conclude that her sentence of life imprisonment was unjustified

under § 3553(a)" at the time of her offense and sentencing.[44]  But this Court must

address the § 3553 factors *today*, not merely the analysis that applied more than 20

---

[42] Eric Licas, "9th coronavirus-related death reported at Terminal Island federal prison," Daily Breeze, May 27, 2020, available at: https://www.dailybreeze.com/2020/05/27/9th-coronavirus-related-death-at-terminal-island-federal-prison/

[43] Federal Bureau of Prisons, "Inmate Death at FCI Butner (Low)," Press Release, 17 September 2020, available at
https://www.bop.gov/resources/news/pdfs/20200917_press_release_bux.pdf.

[44] Dkt. 849 at 25.

years ago.  And this requires consideration of Ms. Friend's record for rehabilitation

in the BOP.  For this reason, this Court ordered the government to address, among

other things: the status of the defendant's educational and vocational training, the

status of any treatment for substance abuse or physical or mental health, and the

defendant's post sentencing conduct, including the defendant's compliance with the

rules of the institution where she is incarcerated.[45] In its response, the government

addressed Ms. Friend's educational record and post-sentencing conduct, reflecting

her behavior over the last 21 years of her life, in one perfunctory sentence.[46] It

offers no analysis whatsoever on the status of her treatment for bipolar disorder,

which has been steady over the last several years, nor does it address the effect that

her bipolar disorder, or the long history of abuse from her husband, would have had

on her decision-making ability at the time of the crime. Taken together, Ms.

Friend's educational and disciplinary record show that, with the correct and ongoing

treatment for her bipolar disorder, Ms. Friend has undergone significant

rehabilitation while in the BOP, and she attests to the fact that she is a very

different person than the one who participated in the horrific crimes of 21 years

ago.[47]

> The government also questions her acceptance of responsibility based on

decisions from 21 years ago to not cooperate with law enforcement and to go to trial.

---

[45] Dkt. 838 at 4.
[46] Dkt. 849 at 26 ("Although her record of prison infractions is minimal, and like most inmates, she has taken advantage of educational opportunities in the BOP, these do not offset the gravity of her crimes.")
[47] *Id.*

Ms. Friend committed the crimes while in a tight-knit and potentially coercive group of people she loved, one of whom, her eldest son, was the "brain child" behind the schemes.[48] But as she says in her statement to the Court today, she takes full responsibility for her crimes, which "weigh on [her] and haunt [her] everyday [*sic*]."[49]

Ms. Friend is not a danger to the community, nor is a continued sentence necessary to protect the public from further crimes by her under § 3553(a)(2)(C). As grave and violent as the crimes that she participated in were, Ms. Friend is now a 69-year-old woman with serious medical conditions. She has complained of pain and numbness in her legs. Not only do the general recidivism rates for women of her age suggest that she is unlikely to recidivate,[50] but the remorse that Ms. Friend feels and the strong rehabilitation she has shown, particularly through her ongoing treatment for bipolar disorder, suggest that Ms. Friend is unlikely to commit any further crimes, much less a crime of the magnitude for which she is in prison. These factors are compounded by the strength of Ms. Friend's release plan – to live with her friend Lori Watson and receive ongoing support from Ms. Watson and their friend Terri Edwards. Both Ms. Watson and Ms. Edwards were themselves

---

[48] *United States v. Phillip Friend*, Case No. 3:99-cr-00201-HEH-RCY, Dkt. No. 836 at 84 (E.D.V.A. January 20, 2020). We note that the government cited to the Joint Appendix from Ms. Friend's direct appeal, but the undersigned counsel was unable to access a copy due to the age of the document.

[49] Ms. Friend's Statement to the Court is attached as Exhibit A.

[50] United States Sentencing Commission, "The Effects of Aging on Recidivism Among Federal Offenders," December 2017 at 15, available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (showing that women aged 60 years or older at age of release have a recidivism rate of 12.0%.)

14

incarcerated, released in 2015 and 2012 respectively, and know the issues and difficulties that can arise for people coming out of prison. Both of them have been extremely successful in re-entering society, with Ms. Watson even building a business in which she will employ Ms. Friend. All of these factors militate against Ms. Friend committing any further crimes.

Similarly, reducing Ms. Friend's sentence by granting her compassionate release is unlikely to have any effect on deterrence, either for Ms. Friend or for others. As stated above, Ms. Friend is a low risk for recidivism. Criminological research has found that there is no basis for "inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects," and that "punishment certainty is far more consistently found to deter crime than punishment severity."[51] Reducing Ms. Friend's sentence at this point is unlikely to have a strong effect on deterrence, and 18 U.S.C. §§ 3553(a)(2)(B) is satisfied by her arrest, conviction, and the 21 years she has already served.

The government's primary argument is that the admittedly horrific nature of the crimes, and Ms. Friend's role in them, both as an active participant, and as a mother, justifies the denial of her motion for compassionate release under 18 U.S.C. §§ 3553 (a)(2)(A). While it is true that Ms. Friend's role in the offense was extremely grave, contrary to the government's assertion, Ms. Friend is not more culpable for her actions because she is the mother of the main perpetrators of the violent acts.

---

[51] Valerie Wright, "Deterrence in Criminal Justice, Evaluating Certainty vs. Severity of Punishment," The Sentencing Project, November 2010 at 4, available at https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf.

As the presentence report makes plain, she was the victim of long-term spousal abuse.  This abuse was witnessed by her children, which can lead to unhealthy family relationships and a number of physical and psychological effects for the victim of abuse, including: higher level of emotional distress, thoughts, or attempts of suicide, alcohol and drug abuse, eating and sleep disorders, physical inactivity, a poor self-esteem, a post-traumatic stress disorder, smoking, self-harm, unsafe sexual behavior, and increased exposure to injuries.[52] In addition, child witnesses of domestic violence are more likely to exhibit violent behavior and have an increased rate of risky and antisocial behavior.[53] Ms. Friend clearly did not have a normal maternal relationship with her sons. Whatever may be said about it now, Ms. Friend was not the ringleader of the group.

Additionally, as noted, she had very recently been diagnosed with bipolar disorder when the crime occurred, which can impair a person's ability to recognize the consequences of their actions.[54] The significant role her untreated mental health issues played in this offense is supported by her lack of prior criminal history.

[52] Zlatka Rakovec-Felser, "Domestic Violence and Abuse in Intimate Relationship from Public Health Perspective," *Health Psychol Res*, 22 October 2014, 1821, doi:10.4081/hpr.2014.1821.
[53] Melissa M. Stiles, "Witnessing Domestic Violence: The Effect on Children," *Am Fam Physician*, 1 December 2002, 2052-67 (available online at: https://www.aafp.org/afp/2002/1201/p2052.html).
[54] Kathleen Holmes, M et al. "Conceptualizing impulsivity and risk taking in bipolar disorder: importance of history of alcohol abuse." *Bipolar disorders* vol. 11,1 (2009), 33-40, available at :10.1111/j.1399-5618.2008.00657 ("Individuals with bipolar disorder (BD) tend to be impulsive and engage in risky behaviors—pleasurable activities with high potential for negative consequences. Indeed, increased risk taking is one of several diagnostic criteria for a manic episode…there is growing evidence that impulsivity is a stable trait characteristic of BD and appears to represent a core feature of the illness.")

Considering her history and characteristics under § 3553(a)(1), the court should temper its evaluation of her role in the crimes.

Finally, though the government does not provide any analysis for its assertion that Ms. Friend's sentence appropriately serves the goals of providing the defendant with needed educational or vocational training, medical care, or other correctional treatment under § 3553(a)(2)(D), that is not the case. Ms. Friend has a high school diploma and adequate education to perform the job that she would have after her release, assisting in Ms. Watson's funeral business. It is true that she receives medical care through the BOP, but could receive better care outside of prison, where she will continue to seek treatment for her bipolar disorder, with support from her friends. She would also be less likely to be exposed to COVID-19, and better able to take steps to protect herself from that and other diseases.

## CONCLUSION

Every day that passes is another day that COVID-19 works its way through the federal prison system. There is an active COVID-19 outbreak at FCI Waseca that poses a grave threat to Ms. Friend, especially considering her underlying health conditions—severe obesity, hyperlipidemia, and hypertension. It could be only a matter of time before she is re-infected. In 2000, this Court sentenced her to the mandatory penalty of life in prison, of which she has served 21 years. The Court did not sentence her to death, nor the pain of suffering serious illness. Releasing her would pose no danger to the community. She only wishes to live out her old age in peace, surrounded by her friends, and giving back to the community.

For those reasons, Ms. Friend respectfully requests that this Court reduce her sentence to time served.

Respectfully submitted,

Vallia Carolyn Friend

By Counsel

Counsel:
/s Lisa M. Lorish
Lisa M. Lorish (VSB No. 81465)[55]
University of Virginia School of Law
Federal Sentence Reduction Clinic
580 Massie Rd
Charlottesville, VA 22903
Lisa_lorish@fd.org

## CERTIFICATE OF SERVICE

I certify that on this 30th day of November 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification (NEF) to all counsel of record.

/s Lisa M. Lorish
Lisa M. Lorish (VSB No. 81465)
University of Virginia School of Law
Federal Sentence Reduction Clinic
580 Massie Rd
Charlottesville, VA 22903
Lisa_lorish@fd.org

---

[55] Counsel wishes to acknowledge and thank Eleanor Coates, a third-year law student with the University of Virginia School of Law Federal Sentence Reduction Clinic, for her substantial contribution to this reply brief.